# THOMAS *v.* GAY.

## GAY *v.* THOMAS.

### APPEALS FROM THE SUPREME COURT OF THE TERRITORY OF OKLAHOMA.

Nos. 287, 439. Argued and submitted October 21, 22, 1897.—Decided February 21, 1898.

The act of the legislature of the Territory of Oklahoma of March 5, 1895, c. 43, which provided that "when any cattle are kept or grazed or any other personal property is situated in any unorganized country, district or reservation of this Territory, such property shall be subject to taxation in the organized county to which said country, district or reservation is attached for judicial purposes," was a legitimate exercise of the Territory's power of taxation, and, when enforced in the taxation of cattle belonging to persons not resident in the Territory grazing upon Indian reservations therein, does not violate the Constitution of the United States.

The Supreme Court of the Territory in this case sustained the authority of the board of equalization to increase the assessment or valuation, and in a subsequent case decided the other way. In view of the fact that the judgment in this case is reversed, and the case remanded for further proceedings, this court declines to pass upon the question.

THESE are cross-appeals from the Supreme Court of the Territory of Oklahoma. The facts, as stated in the opinion of the court below, were as follows:

The appellants are non-residents of the Territory of Oklahoma and owners of large herds of cattle that were kept and grazed, during a portion of the year 1895, in parts of the Osage Indian reservation in this Territory.

The appellees are the board of county commissioners, treasurer and sheriff of Kay County, Oklahoma Territory.

On the third Monday in February, 1894, the Supreme Court of the Territory of Oklahoma, by an order entered on the journals of said court, attached to said county of Kay, for judicial purposes, all the Kaw or Kansas Indian reservation and all of the Osage Indian reservation north of the township line dividing townships 25 and 26 north. All of said reservations so attached to said Kay County for judicial purposes by such

order are without the boundaries of said Kay County as established by the governor and are not within the boundaries of any organized county of this Territory.  Said territory so attached to said county of Kay for judicial purposes is comprised wholly of lands owned and occupied by Indian tribes, and consists principally of wild, unimproved and unallotted lands used for grazing purposes; that plaintiffs in error during the year 1895 and during the month of April of said year drove, transported and shipped to the ranges and pastures in that part of said Osage Indian reservation attached to said Kay County for judicial purposes, as aforesaid, large herds and numbers of cattle, which were taken to said reservation in pursuance and by virtue and authority of certain leases to plaintiffs in error for grazing purposes made by the Osage tribal government under the supervision of the agent in charge of said tribe and upon the ratification and approval of the Commissioner of Indian Affairs and of the Secretary of the Interior, and said cattle of said plaintiffs in error were on the first day of May kept and grazed on that part of said Indian reservation attached to said Kay County for judicial purposes, as aforesaid.

By an act approved March 5, 1895, c. 43, the legislative assembly of the Territory of Oklahoma amended section 13, article 2, chapter 70, of the Oklahoma Statutes relating to revenue, so that the same reads as follows: " That when any cattle are kept or grazed or any other personal property is situated in any unorganized country, district or reservation of this Territory, such property shall be subject to taxation in the organized county to which said country, district or reservation is attached for judicial purposes," and authorized the board of county commissioners of the organized county or counties to which such unorganized country, district or reservation is attached to appoint a special assessor each year, whose duty it should be to assess such property, and conferred upon such special assessor all the powers and required him to perform all the duties of a township assessor.  The assessor so provided for was required to begin and perform his duties between the first day of April and the 25th day of May of each year and

to complete his duties and return his tax lists on or before June 1, and the property therein authorized to be assessed, it was provided, should be valued as of May 1, each year.

In pursuance of the provisions of said act the county commissioners of said Kay County did duly appoint a special assessor for the year 1895 to assess such cattle as were kept and grazed and any other personal property situated in the unorganized country and parts of Indian reservations attached to said Kay County for judicial purposes, and said special assessor did, by virtue of said appointment, assess all the personal property in the territory so attached to the county of Kay for judicial purposes, including all of the cattle of the said appellants kept and grazed in said reservation on the first day of May, 1895. The said special assessor assessed the property of these appellants so located on said territory attached to said county of Kay for judicial purposes, as aforesaid, and returned the same upon an assessment roll at the total valuation of $760,469; that thereafter the said sum was, by the clerk of said county, carried into the aggregate assessment for said county, and by him certified to the auditor of the Territory; that the Territorial board of equalization in acting upon the various assessments of the various counties as certified to said board raised the aggregate valuation of the property returned for taxation upon the tax rolls of said county of Kay thirty-five per cent, and the county clerk for said county carried out the raised valuation so certified to him by said Territorial board of equalization against the property of these appellants and made the aggregate valuation of such property $1,026,634. Thereafter the Territorial board of equalization levied and duly certified to the county clerk of the county of Kay tax levies for Territorial purposes for the year 1895 as follows: General revenue, three mills on the dollar; university fund, one half mill on the dollar; normal school fund, one half mill on the dollar; bond interest fund, one half mill on the dollar; board of education fund, one half mill on the dollar.

The board of county commissioners for the county of Kay made the following levies for the year 1895: for salaries, five

mills on the dollar; for contingent expenses, three mills on the dollar; for sinking fund, one and one half mills on the dollar; for court expenses, two and one half mills on the dollar; for county supplies, three mills on the dollar; for road and bridge fund, two mills on the dollar; for poor fund of said county, one mill on the dollar; for county school fund of said county, one mill on the dollar.

The county clerk of said county of Kay carried the valuation of the property of these plaintiffs in error upon the tax rolls of said county, and against the same extended the levies as aforesaid, and charged against the property of these plaintiffs in error in the aggregate the sum of $26,174.16.

Before these taxes became delinquent, plaintiffs in error began to remove or attempted to remove their respective property from the territory attached to Kay County for judicial purposes and beyond the limits of Oklahoma Territory. The treasurer of said Kay County issued tax warrants for the several amounts of taxes levied against the property of each of said plaintiffs in error, and delivered the same to the sheriff of said county for execution; said sheriff seized certain property of each of appellants by virtue of such tax warrants. The appellants filed their several petitions in the District Court of Kay County, and, on application, obtained injunctions restraining the appellees from making any further attempt to collect such taxes. Afterwards, on motion, the several actions were consolidated into one. To the petition filed in such consolidated action the defendants in error filed a general demurrer. At the hearing, the District Court sustained the demurrer in part and overruled it in part, holding that all of the levies made for Territorial purposes and the county levy for court expenses were valid, and as to those levies the injunction was dissolved; and as to all of the other county levies such injunctions were made perpetual. From that part of the order and judgment of the court, dissolving the injunction as to the Territorial taxes and the one county fund levy, plaintiffs appealed. From that part perpetuating the injunction as to all of the county levies, except that for court expenses, the defendants appealed and filed their cross-petitions

in error, and the case was taken to the Supreme Court of the Territory. In that court the judgment of the District Court was affirmed. Three of the four judges, who sat in the case, agreed in holding that the taxes levied for territorial and court expense funds were valid; two were of opinion that the balance of the taxes were unauthorized; one was of opinion that all the taxes were validly levied, and the fourth judge dissented *in toto.* From that judgment of the Supreme Court of the Territory both parties appealed to this court.

*Mr. Henry E. Asp* and *Mr. John W. Shartel* for Gay.

*Mr. J. F. King* for Thomas and others, county commissioners, submitted on their brief.

*Mr. Jeremiah M. Wilson* and *Mr. O. F. Goddard* filed a brief on behalf of other owners of cattle grazing on the reservations.

*Mr. H. S. Cunningham* filed a brief on behalf of the Territory.

MR. JUSTICE SHIRAS, after stating the case, delivered the opinion of the court.

It is claimed that the legislative assembly of the Territory of Oklahoma was without power to enact the law of March 5, 1895, providing for the taxing of cattle grazing upon the Indian reservations under leases granted by the Indians, because, both before and since the creation of said Territory, exclusive jurisdiction over said Indians and their lands, and over all matters in any way affecting them, or in which they are interested, is in the United States.

It is, indeed, true that the lands in question, constituting the reservations of the Osage and Kansas Indians, are portions of lands previously granted by patent of the United States, in pursuance of the treaty of May 6, 1828, 7 Stat. 311, and of the treaty of December 29, 1835, 7 Stat. 478, to the Cherokee

Nation of Indians, and that it was provided, in those treaties, that the lands so granted should not, without the consent of the Indians, at any future time be "included within the territorial limits or jurisdiction of any State or Territory."

In the subsequent treaty with the Cherokees of July 19, 1866, 14 Stat. 799, 804, it was stipulated that the United States might "settle friendly Indians in any part of the Cherokee country west of the 96th degree, to be taken in a compact form, in quantity not exceeding 160 acres for each member of each of said tribes thus to be settled, the boundaries of each of said districts to be distinctly marked, and the land conveyed in fee simple to each of said tribes, . . . said land to be paid for to the Cherokee Nation, at such price as may be agreed upon between the said parties in interest, subject to the approval of the President."

On the 26th of June, 1866, a treaty was made with the Osage Indians, 14 Stat. 687, wherein it was provided that a large part of the reservation then occupied by that tribe in Kansas was sold outright to the Government for a certain sum of money, and by article 16 of said treaty it was provided that "If said Indians should agree to remove from the State of Kansas and settle on land to be provided for them by the United States in the Indian Territory, on such terms as may be agreed upon between the United States and the Indian tribes now residing in said Territory, or any of them, then the diminished reservation shall be disposed of by the United States in the same manner and for the same purposes as hereinbefore provided in relation to said trust lands, except that fifty per cent of the proceeds of the sale of said diminished reserve may be used by the United States in the purchase of lands for a suitable home for said Indians in said Indian Territory."

On July 15, 1870, 16 Stat. 335, Congress passed an act providing, in substance, that whenever the Osages should agree thereto, in such manner as the President should prescribe, said Indians should be removed from their said diminished reservation in the State of Kansas to the lands to be provided for them in the Indian Territory, "to consist of a tract of land

in compact form, equal in quantity to 160 acres for each member of tribe, to be paid for out of the proceeds of the sales of their lands in the State of Kansas;" and subsequently the Osages were established upon their present reservation, and the Cherokees were paid therefor the sum of $1,650,600; and by an act approved June 5, 1872, 17 Stat. 228, Congress confirmed this reservation in said Cherokee country.

The history of the transfer of the so-called Kaw or Kansas Indians from their reservation in the State of Kansas to lands bought from the Cherokee Nation, constituting their present reservation, was similar to that of the Osages, and calls for no special narration.

In 1883, sufficient money having been realized from the sales to pay for said lands, a deed was duly executed by the Cherokees conveying all their rights and title in and to the United States for the use of the said Osage and Kansas Indians, which deed is recorded in volume 6 of the Indian Deeds in the office of the Commissioner of Indian Affairs in the Department of the Interior.

It is alleged that, by no subsequent treaty, have either the Cherokee or the Osage or Kansas Indians consented that the lands here in question should be included within the limits or jurisdiction of the Territory of Oklahoma: and it is accordingly now contended that under the provision contained in the Cherokee treaties, the lands therein designated should never be embraced within the limits of a Territory or State without the consent of said Indians, the exemption or right thereby created runs with the land, subject to which said lands, or any part thereof, could be conveyed to other Indians, and is not a right belonging solely to the Cherokees, which ceased to exist when the ownership of the Cherokees therein terminated.

Whether, without express stipulation to that effect, the right granted by treaty to the Cherokee Nation, to be exempt, as to their lands, from inclusion within the limits of any Territory or State, passed with the grant of a portion of such lands to the Osage and Kansas Indians, we need not consider, because, even if such were the law, it is conceded that the United States have, by the act of May 2, 1890, 26 Stat. 81,

creating the Territory of Oklahoma, included these Osage and Kansas Indian lands within the geographical limits of said Territory.

It is well settled that an act of Congress may supersede a prior treaty, and that any questions that may arise are beyond the sphere of judicial cognizance, and must be met by the political department of the Government.

"It need hardly be said that a treaty cannot change the Constitution or be held valid if it be in violation of that instrument. This results from the nature and fundamental principles of our Government. The effect of treaties and acts of Congress, when in conflict, is not settled by the Constitution. But the question is not involved in any doubt as to its proper solution. A treaty may supersede a prior act of Congress, and an act of Congress may supersede a prior treaty. *Foster* v. *Neilson*, 2 Pet. 253, 314; *Taylor* v. *Morton*, 2 Curtis, 454.

"In the cases referred to, these principles were applied to treaties with foreign nations. Treaties with Indian nations within the jurisdiction of the United States, whatever considerations of humanity and good faith may be involved and require their faithful observance, cannot be more obligatory. . . . In the case under consideration the act of Congress must prevail as if the treaty were not an element to be considered." *The Cherokee Tobacco*, 11 Wall. 616.

That was a case where an act of Congress extended the revenue laws as respected tobacco over the Indian territories, regardless of provisions in prior treaties that exempted tobacco raised by Indians on their reservations.

The grant of legislative power to the Territory of Oklahoma, contained in the sixth section of the organic act, was as follows:

"The legislative power of the Territory shall extend to all rightful subjects of legislation, not inconsistent with the Constitution and laws of the United States, but no law shall be passed interfering with the primary disposal of the soil; no tax shall be imposed on the property of the United States, nor shall the lands or other property of non-residents be taxed higher than the lands or other property of residents, nor shall

any law be passed impairing the right to private property, nor shall any unequal discrimination be made in taxing different kinds of property, but all property subject to taxation shall be taxed in proportion to its value."

With the Indian reservations brought, by valid legislation, within the limits of the Territory, and with the broad grant of legislative power contained in the section just quoted, we are next to consider objections urged to the validity of the act of the territorial assembly, approved March 5, 1895, wherein it provides that "when any cattle are kept or grazed, or any other personal property is situated in any unorganized country, district or reservation of this Territory, such property shall be subject to taxation in the organized county to which said country, district or reservation is attached for judicial purposes."

Our attention is called to the following provision contained in the first section of the organic act:

" Nothing in this act shall be construed to impair any right now pertaining to any Indians or Indian tribe in said Territory under the laws, agreements and treaties of the United States, or to impair the rights of persons or property pertaining to said Indians, or to affect the authority of the United States to make any regulation or to make any law respecting said Indians, their lands, property or other rights, which it would have been competent to make or enact if this act had not been passed."

And also to section 3 of the act of February 28, 1891, c. 383, 26 Stat. 794, as follows:

" Where lands are occupied by Indians, who have bought and paid for the same, and which lands are not needed for farming or agricultural purposes, and are not desired for individual allotments, the same may be leased by authority of the council, speaking for such Indians, for a period not to exceed five years for grazing or ten years for mining purposes, in such quantities and upon such terms and conditions as the agent in charge of such reservation may recommend, subject to the approval of the Secretary of the Interior."

And the contention is that, irrespective of the question whether said lands are, by the treaties, excluded from the

limits and jurisdiction of the Territory of Oklahoma, the taxation of cattle located for grazing purposes upon the reservations, under leases duly authorized by act of Congress, is a violation of the rights of the Indians and an invasion of the jurisdiction and control of the United States over them and their lands.

As to that portion of the argument which claims that, even if the Indians were not interested in any way in the property taxed, the territorial authorities would have no right to tax the property of others than Indians located upon these reservations, it is sufficient to cite the cases of *Utah & Northern Railway* v. *Fisher*, 116 U. S. 28, and *Maricopa & Phœnix Railroad* v. *Arizona*, 156 U. S. 347, in which it was held that the property of railway companies traversing Indian reservations are subject to taxation by the States and Territories in which such reservations are located.

But it is urged that the Indians are directly and vitally interested in the property sought to be taxed, and that their rights of property and person are seriously affected by the legislation complained of; that the money contracted to be paid for the privilege of grazing is paid to the Indians as a tribe, and is used and expended by them for their own purposes, and that if, by reason of this taxation, the conditions existing at the time the leases were executed were changed, or could be changed by the legislature of Oklahoma at its pleasure, the value of the lands for such purposes would fluctuate or be destroyed altogether according to such conditions.

But it is obvious that a tax put upon the cattle of the lessees is too remote and indirect to be deemed a tax upon the lands or privileges of the Indians. A similar contention was urged in the case of *Erie Railroad* v. *Pennsylvania*, 158 U. S. 431. There the State of Pennsylvania had imposed a tax upon a railroad, situated within the borders of that State, but leased to another railroad company engaged in carrying on interstate commerce, and this tax was measured by a reference to the amount of the tolls received by the lessor company from the lessee company. It was claimed that the imposition of a tax on tolls might lead to increasing them in an effort to throw

their burthen on the carrying company, and thus, in effect, become a tax or charge upon interstate commerce. But this court held that such a tax upon tolls was too indirect and remote to be regarded as a tax or burthen on interstate commerce. A similar view was taken in the case of *Henderson Bridge Co.* v. *Kentucky*, 166 U. S. 150, where a tax imposed by the State of Kentucky on the intangible property of a company which owned and maintained a bridge over a river between two States was contended to be objectionable as constituting a burthen upon interstate commerce, but it was held that the fact that the tax in question was to some extent affected by the amount of the tolls received, and therefore might be supposed to increase the rate of tolls and thus be a burthen on interstate commerce, was too remote and incidental to make it a tax on the business transacted. *Adams Express Co.* v. *Ohio State Auditor*, 166 U. S. 185.

The suggestion that such a tax on the cattle constitutes a tax on the lands within the reasoning in the case of *Pollock* v. *Farmers' Loan and Trust Co.*, 157 U. S. 429, is purely fanciful. The holding there was that a tax on rents derived from lands was substantially a tax on the lands. To make the present case a similar one the tax should have been levied on the rents received by the Indians, and not on the cattle belonging to third parties.

It is further contended that this tax law of the Territory of Oklahoma, in so far as it affects the Indian reservations, is in conflict with the constitutional power of Congress to regulate commerce with the Indian tribes. It is said to interfere with, or impose a servitude upon, a lawful commercial intercourse with the Indians, over which Congress has absolute control, and in the exercise of which control it has enacted the statute authorizing the leasing by the Indians of their unoccupied lands for grazing purposes.

The unlimited power of Congress to deal with the Indians, their property and commercial transactions, so long as they keep up their tribal organizations, may be conceded; but it is not perceived that local taxation, by a State or Territory, of property of others than Indians would be an interference with

Congressional power. It was decided in *Utah & Northern Railway* v. *Fisher*, 116 U. S. 28, that the lands and railroad of a railway company within the limits of the Fort Hill Indian reservation in the Territory of Idaho was lawfully subject to territorial taxation, which might be enforced within the exterior boundaries of the reservation by proper process. The question was similarly decided in *Maricopa & Phœnix Railroad* v. *Arizona Territory*, 156 U. S. 347.

The taxes in question here were not imposed on the business of grazing, or on the rents received by the Indians, but on the cattle as property of the lessees, and, as we have heretofore said that as such a tax is too remote and indirect to be deemed a tax or burthen on interstate commerce, so is it too remote and indirect to be regarded as an interference with the legislative power of Congress.

These views sufficiently dispose of the objections urged against the power of the legislative assembly of Oklahoma to pass laws taxing property within the limits of the Indian reservations and belonging to persons not Indians. We must now consider the objections made to the mode in which that power was exercised in the act of March 5, 1895.

The most fundamental of these objections is found in the assertion that, so far as non-resident owners of cattle grazing within the Indian reservations are concerned, it is taxation without representation, and that such persons derive no benefit from the expenditure of the moneys accruing from the tax.

The organic act, as we have already seen, extends the exterior boundary of the Territory around these Indian reservations. It also provided for the division of the Territory into council and representative districts, and for the election of a legislative assembly and of a delegate to Congress. The Indian reservations were not included within any of the council or representative districts. The act provided that there should be seven counties, and fixed the county seats, and under the authority of the act the governor established the boundaries of these counties. The legislature was authorized to change the boundaries of the original counties, but was not given authority to include these Indian reservations, or any lands not then

open to settlement in any of the counties.　By section nine it was provided that the Territory should be divided into three judicial districts; that the Supreme Court should define such judicial districts; and that the territory not embraced in organized counties should be attached, for judicial purposes, to such organized county or counties as the Supreme Court should determine.　In May, 1890, the Supreme Court made an order attaching the several Indian reservations to certain organized counties for judicial purposes, and by an order on February 3, 1894, attached the reservations in question in this case to Kay County for judicial purposes.

As already stated, by the act of March 5, 1895, it was provided that when any cattle are kept or grazed or any other personal property is situated in any unorganized country, district or reservation, such property shall be subject to taxation in the organized county to which said country, district or reservation is attached for judicial purposes; and provision was made for the appointment of a special assessor for such unorganized country, district or reservation.　Under this condition of affairs it is contended that the taxing power cannot be lawfully exerted as respects property within these reservations.　It is said that those to be affected by the tax have no voice in the election of the legislature to make the laws by which they are to be governed; that they have no school facilities for their children; that they cannot organize towns, so as to have the benefit of the police and sanitary laws of the Territory; that the officers of Kay County have no authority to expend any portion of the moneys raised by this taxation in improving roads within the Indian reservation; that they cannot participate in the election of the territorial delegate; and that they are not benefited by the taxes appropriated for salary fund, contingent expense fund, sinking fund, road and bridge fund, poor fund, etc.

Undoubtedly there are general principles, familiar to our systems of state and Federal government, that the people who pay taxes imposed by laws are entitled to have a voice in the election of those who pass the laws, and that taxes must be assessed and collected for public purposes, and that the duty

or obligation to pay taxes by the individual is founded in his participation in the benefits arising from their expenditure. But these principles, as practically administered, do not mean that no person, man, woman or child, resident or non-resident, shall be taxed, unless he was represented by some one for whom he had actually voted, nor do they mean that no man's property can be taxed unless some benefit to him personally can be pointed out. Thus it has been held that personal allegiance has no necessary connection with the right of taxation; an alien may be taxed as well as a citizen. *Mager* v. *Grima*, 8 How. 490; *Witherspoon* v. *Duncan*, 4 Wall. 210. So, likewise, it is settled law that the property, both real and personal, of non-residents may be lawfully subjected to the tax laws of the State in which they are situated.

The specific objection made to the validity of these taxes as imposed on personal property located in unorganized countries or in the reservations does not seem to us to be well founded. We have already cited the cases of *Utah & Northern Railway Company* v. *Fisher*, 116 U. S. 28, and *Maricopa & Phœnix Railroad* v. *Arizona*, 156 U. S. 347, wherein territorial tax laws were held to have a valid operation over property lying within Indian reservations. *Union Pac. Railroad* v. *Peniston*, 18 Wall. 5, 37, was a case where unorganized country was attached by law to an organized county for judicial and revenue purposes, and the law was sustained, as appears in the decision delivered by Mr. Justice Strong, as follows:

"It remains only to notice one other position taken by the complainants. It is that if the act of the State under which the tax was laid be constitutional in its application to their property within Lincoln County, the property outside of Lincoln County is not lawfully taxable by the authorities of that county under the laws of the State. To this we are unable to give our assent. By the statutes of Nebraska the unorganized territory west of Lincoln County, and the unorganized country of Cheyenne, are attached to the county of Lincoln for judicial and revenue purposes. The authorities of that county, therefore, were the proper authorities to levy the tax upon the property thus placed under their charge for revenue purposes."

In *Llano Cattle Co.* v. *Faught*, 5 S. W. Rep. 494 (Texas), the case was that an unorganized country was attached by law to the organized county of Scurry for judicial purposes. The officers of Scurry County assessed and levied county taxes upon the cattle of the plaintiff, a foreign corporation, kept in the unorganized country, and it was held that the unorganized country, being in effect a part of the county to which it was so attached, the collection of taxes on such personalty of a non-resident may be enforced by the tax collector of the latter county. We are referred to similar decisions in Kansas : *Philpin* v. *McCarty*, 24 Kansas, 393 ; in Ohio : *Kemper* v. *McClelland*, 19 Ohio, 308 ; in Iowa : *Hilliard* v. *Griffin*, 33 N. W. Rep. 156 ; in Michigan : *Comins* v. *Township of Harrisville*, 45 Michigan, 442.

It is further contended that, while the taxes assessed for territorial and court expense funds may be valid, yet that the balance of the taxes, levied for county purposes and expended within the geographical limits of Kay County, are unauthorized, for the reason that the people on these reservations are not interested in such taxes, and receive no benefit from their expenditure. But, as it seems to us, it cannot be maintained that those plaintiffs whose cattle are within the protection of the laws of Oklahoma receive no benefit from the expenditures in Kay County. Certainly they have some advantage in the improvement of the roads within that county, when they journey to and from the towns and settlements in the organized county. They are interested in the prevalence of law and order in the communities adjacent to their property, and in the provision made for the care of the poor and insane. It is to be presumed that they have a right to send their children to the schools in the organized county.

The cases, both state and Federal, are numerous in which it has been held that taxes, otherwise lawful, are not invalidated by the allegation, or even the fact, that the resulting benefits are unequally shared.

In *Kelly* v. *Pittsburg*, 104 U. S. 78, the complaint was that certain water, street, gas, school and other taxes were unlawfully assessed against the property of the plaintiff, which,

though lying within city limits, were not benefited by such taxes; but this court, affirming the Supreme Court of Pennsylvania, said:

"We are unable to see that the taxes levied on this property were not for a public use. Taxes for schools, for the support of the poor, for protection against fire, and for waterworks are the specific taxes found in the list complained of. We think it will not be denied by any one that these are public purposes in which the whole community have an interest, and for which, by common consent, property owners everywhere in this country are taxed. There are items styled city tax and city buildings which, in the absence of any explanation, we must suppose to be for the good government of the city, and for the construction of such buildings as are necessary for municipal purposes. . . . It may be true that the plaintiff does not receive the same amount of benefit from some or any of these taxes as do citizens living in the heart of the city. It is probably true, from the evidence found in this record, that his tax bears a very unjust relation to the benefits received as compared with its amount. But who can adjust with precise accuracy the amount which each individual in an organized civil community shall contribute to sustain it, or can insure in this respect absolute equality of burthens and fairness in their distribution among those who must bear them?

"We cannot say judicially that the plaintiff received no benefit from the city organization. These streets, if they do not penetrate his farm, lead to it. The waterworks will probably reach him some day, and may be near enough to him now to serve him on some occasion. The schools may receive his children, and in this regard he can be in no worse condition than those living in the city who have no children, and yet who pay for the support of the schools. Every man in a county, a town, a city or a State is deeply interested in the education of the children of the community, because his peace and quiet, his happiness and prosperity, are largely dependent upon the intelligence and moral training which it is the object of public schools to supply to the children of his neighbors and associates, if he has none himself."

It is no objection to a tax that the party required to pay it derives no benefit from the particular burthen; *e.g.* a tax for school purposes levied upon a manufacturing corporation. But, in truth, benefits always flow from the appropriation of public moneys to such purposes, which corporations in common with national persons receive in the additional security to their property and profits. *Amesbury Nail Factory Co.* v. *Weed,* 17 Mass. 53.

In Cooley on Taxation, 16, the result of a wide examination of the cases is thus stated:

"If it were practicable to do so, the taxes levied by any government ought to be apportioned among the people according to the benefit which each receives from the protection the Government affords him; but this is manifestly impossible. The value of life and liberty, and of the social and family rights and privileges cannot be measured by any pecuniary standard; and by the general consent of civilized nations, income or the sources of income are almost universally made the basis upon which the ordinary taxes are estimated. This is upon the assumption, never wholly true in point of fact, but sufficiently near the truth for the practical operations of Government, that the benefit received from the Government is in proportion to the property held, or the revenue enjoyed under its protection; and though this can never be arrived at with accuracy, through the operation of any general rule, and would not be wholly just if it could be, experience has given us no better standard, and it is applied in a great variety of forms, and with more or less approximation to justice and equality. But, as before stated, other considerations are always admissible; what is aimed at is, not taxes strictly just, but such taxes as will best subserve the general welfare of the political society."

The fact that the taxes in question are levied on personal property only and thus exempt real property is urged as an objection to the validity of the act. It is claimed that such an exemption operates as an unjust discrimination.

As the owners of the cattle taxed own no real estate within the Indian reservation, this objection, if sound, would render

it impossible to tax the cattle at all.. But it is the usual course in tax laws to treat personal property as one class and real estate as another, and it has never been supposed that such classification created an illegal discrimination, because there might be some persons who owned only personal property, and others who owned property of both classes. Again, it is complained that this law violates the principle of uniformity, and operates as an unjust discrimination, because it provides for an assessment of cattle, kept and grazed on the Indian reservations, at a different time from that provided for the assessment of personal property, including cattle, in the organized country.

It is not unusual for tax laws to authorize the assessment of different classes of property at different dates, and even of the same classes of property in different localities at different dates. Such matters of regulation must be supposed to be within the power of the State or Territory, and to have their reasons in special facts known to the legislature. We are informed that the revenue laws of Oklahoma provide that real estate shall be valued for taxation on the first day of January, and personal property in the organized counties on the first day of February of each year, and the personal property upon the reservations on May 1. The gravamen of the complaint is that cattle are fatter and more valuable on May 1 than on February 1, and hence there is an inequality in the assessments. On the other hand, it is claimed that if the cattle on the reservations were to be valued for taxation in February, the larger part would escape taxation, as they are not driven to the reservations till April.

A similar objection was urged against the validity of a tax law of the State of Wisconsin, wherein April 1 was fixed as the date for assessing saw logs belonging to non-residents and May 1 for assessing saw logs of residents. The court said:

"It is claimed that this law violates the principle of uniformity in providing for an assessment of the logs of a non-resident at a different time than that provided in the case of residents; that for the same reason it discriminates unjustly against non-residents. But I am of opinion that the case

does not come within either of these principles. . . . The legislature was aware that the logs of non-residents as well as resident owners were liable to be floated out of the State in the month of April." *Nelson Lumber Co. v. Loraine* (Ct. Ct. of U. S. for Dist. of Wisconsin), 22 Fed. Rep. 54.

In Missouri a statute was held valid which provided that real property should be assessed every two years in all counties outside of St. Louis, and that all property in the city of St. Louis should be assessed every year, for state and municipal taxes, and this although in the particular case it was shown that this difference in the time of the assessments made a considerable difference in the amount of the taxes. *State v. New Lindell Hotel Co.*, 9 Mo. App. 450.

A law providing different times for assessments for state taxes in the State of New York was held to be legal. *People v. Commissioners of Taxes*, 91 N. Y. 593.

Several other provisions of the act in question are pointed to as creating discriminations against taxpayers whose property is in the unorganized district and reservations, such as these; that city and township assessors are required to be residents and qualified voters in the township or city where elected, but there is no such requirement imposed on the special assessor appointed by the board of county commissioners to assess the personal property in the reservations and unorganized districts; that the several township and city assessors are required to meet at the county seat and agree upon an equal cash basis of valuation of all property that they may be called upon to assess, but in this matter the special assessors do not participate; that the township assessor, clerk and treasurer are a township board of equalization, and the mayor, city clerk and city assessor are a city board of equalization, but that, in the case of the unorganized districts and reservations, the board of county commissioners act as a board of equalization, etc.

Without undertaking to enumerate all the instances in which there is some difference of procedure in respect to property assessed within the organized counties and property assessed in the unorganized districts and reservations, or to

consider minutely the several objections that are urged to such differences, we do not perceive that the questions suggested are for the courts. Clearly these are matters of detail within the legislative discretion. It is the lawmaking power which is to determine all questions of discretion or policy in ordering and apportioning taxes; which must make all the necessary rules and regulations, and decide upon the agencies by means of which the taxes shall be collected. When, as may sometimes happen, the legislature transcends its functions and enacts, in the guise of a tax law, a law whereby the property of the citizen is confiscated, or taken for private purposes, the judiciary has the right and duty to interpose. But such a case is not presented by this record.

These views dispose of the objections urged against the validity of the act of March 5, 1895, and leave only for consideration error assigned to the action of the territorial board of equalization in adding thirty-five per cent to the assessment or valuation made by the officer or officers to whom the duty to make the assessment is by the statute expressly committed. It is alleged that this order by the board of equalization was unauthorized and void.

We learn from the opinion of the Supreme Court of Oklahoma in the present case that this question of the power of the territorial board of equalization to raise the valuation of the properties to be taxed had been, in the previous case of *Wallace* v. *Bullen,* decided affirmatively, and that such decision was followed in the present case.

We are informed, however, by the brief filed in behalf of the petitioners that subsequently, on September 3, 1897, in the case of *Gray* v. *Stiles,* 49 Pac. Rep. 1083, the subject was again considered and an opposite conclusion reached. It is also asserted in said brief that the question is one of general importance, and that a final decision of it may affect the validity of municipal obligations heretofore issued in the Territory.

Such allegations disclose that there are parties not represented before us whose interests are involved in the inquiry. The case was heard in the trial court on a demurrer to the

petition, and the question of the validity of the action of the board of equalization in raising the assessed values throughout the Territory was put by the Supreme Court, without discussion, on its previous decision in the case of *Wallace* v. *Bullen.* We are also informed by the briefs that the case just mentioned is now pending before the Supreme Court on an order for a rehearing. Whether the facts pertaining to the action of the board of equalization in this particular were the same in *Gray* v. *Stiles* as those in this case, we cannot say from this record.

In such circumstances, we think it would be premature for this court to determine the question.

As, for the reasons before given, the judgment of the Supreme Court must be reversed, that court will have an opportunity to deal with this question, if it think fit, upon a rehearing.

*The judgment of the Supreme Court of Oklahoma is accordingly reversed, and the cause is remanded with directions to proceed in conformity with this opinion.*