**TOTUS et al. v. UNITED STATES et al.**
**No. 64.**

District Court, E. D. Washington, S. D.
May 28, 1941.

E. A. Towner, of Portland, Or., for plaintiffs.

Lyle Keith, U. S. Atty., of Spokane, Wash., for defendants.

### SCHWELLENBACH, District Judge.

This is an action brought by Watson Totus and seventy (70) members of the Yakima Indian Tribe to restrain the defendants and each of them from enforcing the provisions of the Selective Training and Service Act of 1940, 50 U.S.C.A.Appendix § 301 et seq., as against the plaintiffs or any other members of the Yakima Tribe. Defendants are the United States of America, Clarence Dykstra as National Director of the Selective Training and Service Act, Maurice Thompson (Morris Thompson) as State Director of Selective Service and the other seven defendants who are members of Draft Boards Numbers 1 and 2 for Yakima County, Washington. Plaintiffs' action is based upon two grounds:

1. That the plaintiffs are alien residents within the United States who have not declared their intention to become citizens thereof.

2. That, under a Treaty dated June 9, 1855, between the United States and the Yakima Nation of Indians, the United States agreed that the members of the Yakima Tribe would not be called upon to make war upon any other Tribe except in self defense and that, within the intent and meaning of the contracting parties, the Tribe meant and still does mean all peoples or members of the various races and tribes of all nations.

Service was attempted to be secured on the defendant Dykstra by means of personal service upon such defendant in the City of Washington, District of Columbia, with a sixty-day summons. Service on the defendant Thompson was attempted to be made by personal service at Camp Murray, Washington, with a sixty-day summons. Personal service was attempted to be secured on the Board Members by personal service with a twenty-day summons. Motions to dismiss have been submitted by all of the defendants except the United States of America on jurisdictional grounds. In addition, the defendant Thompson and the defendant The United States of America have submitted motions to dismiss on the ground that the complaint fails to state a claim against such defendants upon which relief could be granted.

I will first consider the motion of defendant Dykstra. The attempted service upon him in the District of Columbia is clearly fatally defective. The statute provides, 28 U.S.C.A. § 112: "Except as provided in sections 113 to 118 of this title, no civil suit shall be brought in any district court against any person by any original process or proceeding in any other district than that whereof he is an inhabitant." The attempted service here does not come within the purview of Sections 113 to 118 of that Title. The precise question here involved was decided in Putnam v. Ickes, 64 App.D.C. 339, 78 F.2d 223, decided May 6, 1935. That action was brought in the District of Columbia. Service was secured on the Secretary in that District and an attempt was made to acquire jurisdiction in that action over the other defendants who resided in the State of California. The quashing of service was upheld by the Court of Appeals for the District of Columbia, and certiorari was later denied by the Supreme Court in 296 U.S. 612, 56 S.Ct. 132, 80 L.Ed. 434. Mr. Dykstra's motion must be granted.

The next point for consideration is the jurisdictional motion filed by defendant Thompson. Service upon him was secured at Camp Murray, Washington. Camp Murray is located in the Western District of Washington. The District Attorney contends that since that is outside the territorial limits of this Court, jurisdiction over this defendant could not be secured. This case clearly comes within one of the exceptions hereinabove referred to in the quotation from Section 112 of Title 28, U.S.C.A. Section 113 provides in part: "But if there are two or more de-

fendants, residing in different districts of the State, it may be brought in either district." That statute alone would have required us to look further into the question as to whether or not the defendants within the Eastern District of Washington were necessary parties to this action. Such consideration is, in my opinion, no longer necessary. The June 15, 1935, amendment, Section 503, Title 28, U.S.C.A., by which the words "throughout the district" were eliminated from that section which deals with the authority of marshals to make service, when read in connection with Rule 4(f) of the "Rules of Civil Procedure for the District Courts of the United States", 28 U.S.C.A. following section 723c, makes it certain that civil process does now run outside of the district in which it is issued within the territorial confines of the State. Rule 4(f) reads: "(f) Territorial Limits of Effective Service. All process other than a subpœna may be served anywhere within the territorial limits of the state in which the district court is held and, when a statute of the United States so provides, beyond the territorial limits of that state. A subpœna may be served within the territorial limits provided in Rule 45." Defendant Thompson's motion under subdivisions (4 and 5) of subdivision (b), Rule 12 is, therefore, denied.

■ The defendant Board Members moved to dismiss under the same provisions of the Rules on the ground that service upon them was by means of a twenty-day summons. They rely upon that portion of subdivision (a) of Rule 12 which reads: "The United States or an officer or any agency thereof shall serve an answer to the complaint or to a cross claim, or a reply to a counterclaim, within sixty days after the service upon the United States Attorney of the pleading in which the claim is asserted." In this regard notice should be taken of the note 1 in reference to form 1, 28 U.S.C.A. following section 723c, where it is stated: "If the United States or an officer or agency thereof is a defendant, the time to be inserted as to it is 60 days." The question involved in the motions of these defendants rests upon whether or not they are officers of the United States. The provision of the Selective Training and Service Act of 1940, 50 U.S.C.A. App. § 310, reads: "Each local board shall consist of three or more members to be appointed by the President, from recommendations made by the respec-

tive Governors or comparable executive officials."

Article II of the Constitution provides in the second section, second paragraph thereof: "He [the President] shall have power, by and with the Advice and Consent of the Senate, to make Treaties, providing two thirds of the Senators present concur; and he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law; but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." The pertinent decisions of the Supreme Court touching upon the interpretation of this constitutional provision are the following: United States v. Hartwell, 6 Wall. 385, 18 L.Ed. 830; United States v. Germaine, 99 U.S. 508, 25 L.Ed. 482; United States v. Mouat, 124 U.S. 303, 8 S.Ct. 505, 31 L.Ed. 463; United States v. Smith, 124 U.S. 525, 8 S.Ct. 595, 31 L.Ed. 534.

From the foregoing decisions there can be no doubt but that these defendants, as members of the local Boards, were officers of the United States. They were appointed by the President under the authority of a Statute enacted by the Congress.

The mere fact that the Statute provides for the recommendation to the President of names by the Governors of the States does not detract from the status of these defendants as officers of the United States. It is a fact that the President makes very few appointments except on the recommendation of someone. It is a fact that, through the years, very well recognized practices have been developed as to who are entitled to make such recommendations. For example, there is a very clearly defined distinction as to which recommendations may be made by the Members of the Senate of the United States and those that may be made by the Members of the House of Representatives. The mere fact that the Congress saw fit to specifically provide in the law who was to make the recommendation in the case of these appointees does not change the status of their appointments.

This precise question was discussed during the World War by the Judge of the

District Court of the Western District of New York in the case of United States v. Bordonaro, 253 F. 477. This was the language used: "The members of local boards appointed for carrying out the provisions of the Selective Draft Act are appointed by the President, and it is entirely immaterial that the appointments are made upon the recommendations of the Governors of the various states."

Since the seven defendants are officers of the United States and, as such, entitled to be served by sixty-day summons, their motions to dismiss must be granted.

■■ This leaves for consideration the motion of the United States of America and of defendant Thompson going to the merits of the plaintiffs' bill of complaint. The first contention in the bill is that the plaintiffs are not citizens of the United States and have not declared their intention to become citizens. Any doubt which might have existed concerning the citizenship of Indians or members of Indian tribes in this country was set at rest by the adoption of the Nationality Code of 1940. That act provided, 8 U.S.C.A. § 601:

"The following shall be nationals and citizens of the United States at birth: * * *

"(b) A person born in the United States to a member of an Indian, Eskimo, Aleutian, or other aboriginal tribe: Provided, That the granting of citizenship under this subsection shall not in any manner impair or otherwise affect the right of such person to tribal or other property."

The main controversy as to the citizenship status of Indians arose out of the opinion of the Supreme Court of the United States in the case Elk v. Wilkins, 112 U.S. 94, 5 S.Ct. 41, 43, 28 L.Ed. 643, decided November 3, 1884. It was there held that a person born in the United States to members of an Indian Tribe had not acquired citizenship of the United States at birth not having been born "subject to the jurisdiction thereof," within the meaning of the Fourteenth Amendment. Since that time the Congress passed six Acts conferring citizenship upon Indians. The Act of June 2, 1924, 43 Stat. 253, 8 U.S.C.A. § 3, was the last of these and it provided: "All non-citizen Indians born within the territorial limits of the United States be, and they are hereby, declared to be citizens of the United States."

Since this act did not purport to change the Tribal relationship of Indians in the United States, it was not clear that it was applicable to citizens born after its passage and fear was expressed that it was limited to non-citizen Indians born within the territorial limits of the United States who were living on the effective date of the act and who by it were made citizens of the United States. The Congressional purpose of subsection (b) was to make clear that such persons are born citizens of the United States.

The plaintiffs' second contention is based upon Article VIII of the Treaty negotiated and signed June 9, 1855, and ratified by the United States Senate on March 8, 1859, 12 Stat. 954. It is one of the famous so-called Stevens Treaties being one of many negotiated by Isaac Ingalls Stevens, the first Territorial Governor and Superintendent of Indian Affairs for the Territory of Washington. Article VIII provided:

"The aforesaid confederated tribes and bands of Indians acknowledge their dependence upon the government of the United States, and promise to be friendly with all citizens thereof, and pledge themselves to commit no depredations upon the property of such citizens.

"And should any one or more of them violate this pledge, and the fact be satisfactorily proved before the agent, the property taken shall be returned, or in default thereof, or if injured or destroyed, compensation may be made by the government out of the annuities.

"Nor will they make war upon any other tribe, except in self-defence, but will submit all matters of difference between them and other Indians to the government of the United States or its agent for decision, and abide thereby. And if any of the said Indians commit depredations on any other Indians within the Territory of Washington or Oregon, the same rule shall prevail as that provided in this article in case of depredations against citizens. And the said confederated tribes and bands of Indians agree not to shelter or conceal offenders against the laws of the United States, but to deliver them up to the authorities for trial."

■ The plaintiffs, in Paragraph V of their bill of complaint, allege "that within the intent and meaning of the contracting

parties thereto the word tribe meant and does still mean all peoples or members of the various races and tribes of all nations." Counsel for plaintiffs contends that he is entitled to submit oral testimony as to the meaning of this language. Were this an ordinary contract or a treaty between the United States and any other sovereign state, I would have no difficulty in holding that the language was so clear and unambiguous that resort to oral testimony as to the intent would be improper. However, our courts have long recognized that a different rule must be applied in the construction of Indian treaties than in the construction of any other form of writing. Starr v. Long Jim, 227 U.S. 613, 33 S.Ct. 358, 57 L.Ed. 670; United States v. Shoshone Tribe, 304 U.S. 111, 58 S.Ct. 794, 82 L.Ed. 1213; Jones v. Meehan, 175 U.S. 1, 20 S. Ct. 1, 5, 44 L.Ed. 49. The reason for this rule is fully stated in the last cited case: "In construing any treaty between the United States and an Indian tribe, it must always (as was pointed out by the counsel for the appellees) be borne in mind that the negotiations for the treaty are conducted, on the part of the United States, an enlightened and powerful nation, by representatives skilled in diplomacy, masters of a written language, understanding the modes and forms of creating the various technical estates known to their law, and assisted by an interpreter employed by themselves; that the treaty is drawn up by them, and in their own language; that the Indians, on the other hand, are a weak and dependent people, who have no written language and are wholly unfamiliar with all the forms of legal expression, and whose only knowledge of the terms in which the treaty is framed is that imparted to them by the interpreter employed by the United States; and that the treaty must therefore be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians." If it lay within the power of this Court to pass upon this question, I should be compelled to hold that the plaintiffs' contention in this regard must necessarily be sustained.

However, there are two reasons why these last two motions for dismissal must be granted:

■ First: This Treaty was clearly superseded by the Selective Training and Service Act of 1940. "Except as provided in this Act, all laws and parts of laws in conflict with the provisions of this Act are hereby suspended to the extent of such conflict for the period in which this Act shall be in force." 50 U.S.C.A. Appendix § 316. The Constitution provides in Article VI: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land." Clause 2. It has long been recognized that the Congress has the right and the power to repeal a treaty or any provision thereof. Cherokee Tobacco Cases, 11 Wall. 616, 20 L.Ed. 227; Head Money Cases, 112 U.S. 580, 5 S.Ct. 247, 28 L.Ed. 798; Thomas v. Gay, 169 U.S. 264, 18 S.Ct. 340, 42 L.Ed. 740; Sanchez v. United States, 216 U.S. 167, 30 S.Ct. 361, 54 L.Ed. 432; Summertime v. Local Board, Division No. 10, D. C., 248 F. 832; Ex parte Blazekovic, D. C., 248 F. 327.

The rule is stated in Thomas v. Gay, supra [169 U.S. 264, 18 S.Ct. 342, 42 L.Ed. 740], as follows: "The effect of treaties and acts of congress, when in conflict, is not settled by the constitution. But the question is not involved in any doubt as to its proper solution. A treaty may supersede a prior act of congress, and an act of congress may supersede a prior treaty." That the rule applies to Indian treaties as well as others was clearly determined in the Cherokee Tobacco Cases [11 Wall. 621, 20 L.Ed. 227]: "In the cases referred to these principles were applied to treaties with foreign nations. Treaties with Indian nations within the jurisdiction of the United States, whatever considerations of humanity and good faith may be involved * * * cannot be more obligatory." Since the Congress could repeal the provisions of the treaty, it certainly has the right to suspend them during the period of the emergency.

■ Second: This Court has no right to grant equitable relief as against the officers of the Executive branch of the Government in the performance of their duties under an Act of Congress when only personal rights are involved. Bonifaci v. Thompson, D.C., 252 F. 878; Angelus v. Sullivan, 2 Cir., 246 F. 54; Green v. Mills, 4 Cir., 69 F. 852, 30 L.R.A. 90; In re Sawyer, 124 U.S. 200, 8 S.Ct. 482, 31 L.Ed. 402.

From the foregoing, it will be seen that the motions interposed by the defendants United States of America and Thompson must be granted.