*2040 Justice SOTOMAYOR, concurring.
The doctrine of tribal immunity has been a part of American jurisprudence for well over a century. See, e.g., Parks v. Ross, 11 How. 362, 13 L.Ed. 730 (1851) ; Struve, Tribal Immunity and Tribal Courts, 36 Ariz. St. L.J. 137, 148-155 (2004) (tracing the origins of the doctrine to the mid-19th century); Wood, It Wasn't An Accident: The Tribal Sovereign Immunity Story, 62 Am. U.L. Rev. 1587, 1640-1641 (2013) (same). And in more recent decades, this Court has consistently affirmed the doctrine. See, e.g., United States v. United States Fidelity & Guaranty Co ., 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940) ; Puyallup Tribe, Inc. v. Department of Game of Wash., 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977) ; C & L Enterprises, Inc . v. Citizen Band Potawatomi Indian Tribe of Okla ., 532 U.S. 411, 418, 121 S.Ct. 1589, 149 L.Ed.2d 623 (2001). Despite this history, the principal dissent chides the Court for failing to offer a sufficient basis for the doctrine of tribal immunity, post, at 2046 (opinion of THOMAS, J.), and reasons that we should at least limit the doctrine of tribal sovereign immunity in ways that resemble restrictions on foreign sovereign immunity.
*805 The majority compellingly explains why stare decisis and deference to Congress' careful regulatory scheme require affirming the decision below. I write separately to further detail why both history and comity counsel against limiting Tribes' sovereign immunity in the manner the principal dissent advances.
I
Long before the formation of the United States, Tribes "were self-governing sovereign political communities." United States v. Wheeler, 435 U.S. 313, 322-323, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978). And Tribes "have not given up their full sovereignty." Id., at 323, 98 S.Ct. 1079. Absent contrary congressional acts, Tribes "retain their existing sovereign powers" and "possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status." Ibid. See also 25 U.S.C. § 1301(1) (affirming Tribes' continued "powers of self-government"). In this case then, the question is what type of immunity federal courts should accord to Tribes, commensurate with their retained sovereignty.
In answering this question, the principal dissent analogizes tribal sovereign immunity to foreign sovereign immunity. Foreign sovereigns (unlike States) are generally not immune from suits arising from their commercial activities. Post, at 2057; see also Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1605(a)(2) (commercial-activity exception to foreign sovereign immunity). This analogy, however, lacks force. Indian Tribes have never historically been classified as "foreign" governments in federal courts even when they asked to be.
The case of Cherokee Nation v. Georgia, 5 Pet. 1, 8 L.Ed. 25 (1831), is instructive. In 1828 and 1829, the Georgia Legislature enacted a series of laws that purported to nullify acts of the Cherokee government and seize Cherokee land, among other things. Id ., at 7-8. The Cherokee Nation sued Georgia in this Court, alleging that Georgia's laws violated federal law *806 and treaties. Id ., at 7. As the constitutional basis for jurisdiction, the Tribe relied on Article III, § 2, cl. 1, which extends the federal judicial power to cases "between a state, or the citizens thereof, and foreign states, citizens, or subjects." 5 Pet., at 15 (internal quotation marks omitted). But this Court concluded that it lacked jurisdiction because Tribes were not "foreign state[s]." Id ., at 20. The Court reasoned that "[t]he condition of the Indians in relation *2041 to the United States is perhaps unlike that of any other two people in existence." Id., at 16. Tribes were more akin to "domestic dependent nations," the Court explained, than to foreign nations. Id ., at 17. We have repeatedly relied on that characterization in subsequent cases. See, e.g., Oklahoma Tax Comm'n v. Citizen Band Potawatomi Tribe of Okla., 498 U.S. 505, 509, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991) ; Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 141, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982). Two centuries of jurisprudence therefore weigh against treating Tribes like foreign visitors in American courts.
II
The principal dissent contends that whenever one sovereign is sued in the courts of another, the question whether to confer sovereign immunity is not a matter of right but rather one of "comity." Post, at 2047. But in my view, the premise leads to a different conclusion than the one offered by the dissent. Principles of comity strongly counsel in favor of continued recognition of tribal sovereign immunity, including for off-reservation commercial conduct.
Comity-"that is, 'a proper respect for [a sovereign's] functions,' " Sprint Communications, Inc. v. Jacobs, 571 U.S. ----, ----, 134 S.Ct. 584, 591, 187 L.Ed.2d 505 (2013) -fosters "respectful, harmonious relations" between governments, Wood v. Milyard, 566 U.S. ----, ----, 132 S.Ct. 1826, 1832-1833, 182 L.Ed.2d 733 (2012). For two reasons, these goals are best served by recognizing sovereign immunity for Indian Tribes, including immunity for off-reservation conduct, except where Congress has expressly abrogated it. First, a legal rule that permitted *807 States to sue Tribes, absent their consent, for commercial conduct would be anomalous in light of the existing prohibitions against Tribes' suing States in like circumstances. Such disparate treatment of these two classes of domestic sovereigns would hardly signal the Federal Government's respect for tribal sovereignty. Second, Tribes face a number of barriers to raising revenue in traditional ways. If Tribes are ever to become more self-sufficient, and fund a more substantial portion of their own governmental functions, commercial enterprises will likely be a central means of achieving that goal.
A
We have held that Tribes may not sue States in federal court, Blatchford v. Native Village of Noatak, 501 U.S. 775, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991), including for commercial conduct that chiefly impacts Indian reservations, Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). In Seminole Tribe, the Tribe sued the State of Florida in federal court under the Indian Gaming Regulatory Act (IGRA)-the same statute petitioner relies on here. The suit alleged that Florida had breached its statutory "duty to negotiate in good faith with [the Tribe] toward the formation of a [gaming] compact." Id., at 47, 116 S.Ct. 1114. This Court held that state sovereign immunity prohibited such a suit.
Importantly, the Court barred the Tribe's suit against Florida even though the case involved the State's conduct in the course of commercial negotiations. As this Court later observed, relying in part on Seminole Tribe, the doctrine of state sovereign immunity is not "any less robust" when the case involves conduct "that is undertaken for profit, that is traditionally performed by private citizens and corporations, and that otherwise resembles the behavior of 'market participants.' " College Savings Bank v. Florida Prepaid *2042 Postsecondary Ed. Expense Bd., 527 U.S. 666, 684, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999). Nor did Seminole Tribe adopt a state corollary to the "off-reservation" exception to tribal sovereign immunity that the principal dissent urges today. To the contrary, the *808 negotiations in Seminole Tribe concerned gaming on Indian lands, not state lands.
As the principal dissent observes, "comity is about one sovereign respecting the dignity of another." Post, at 2047. This Court would hardly foster respect for the dignity of Tribes by allowing States to sue Tribes for commercial activity on State lands, while prohibiting Tribes from suing States for commercial activity on Indian lands. Both States and Tribes are domestic governments who come to this Court with sovereignty that they have not entirely ceded to the Federal Government.
Similar asymmetry would result if States could sue Tribes in state courts.[1] In Nevada v. Hicks, 533 U.S. 353, 355, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001), this Court considered whether a tribal court had "jurisdiction over civil claims against state officials who entered tribal land to execute a search warrant against a tribe member suspected of having violated state law outside the reservation." It held that the tribal court did not. Id., at 374, 121 S.Ct. 2304. In reaching that conclusion, the Court observed that "[s]tate sovereignty does not end at a reservation's border." Id., at 361, 121 S.Ct. 2304. And relying on similar principles, some federal courts have more explicitly held that tribal courts may not entertain suits against States. See, e.g., Montana v. Gilham, 133 F.3d 1133, 1136-1137 (C.A.9 1998) (holding that while neither "the Eleventh Amendment [n]or congressional act" barred suits against States in tribal courts, "the inherent sovereign powers of the States" barred such suits). To the extent Tribes are barred from suing in tribal courts, it would be anomalous to permit suits against Tribes in state courts.
Two of the dissenting opinions implicitly address this asymmetry. The principal dissent reasons that States and Tribes should be treated differently for purposes of sovereign immunity because-unlike tribal sovereign immunity- *809 state sovereign immunity has constitutional origins. Post, at 2047, n. 1. Justice GINSBURG offers another view: that Tribes and States should both receive less immunity. She expresses concerns about cases like Seminole Tribe, pointing to dissents that have catalogued the many problems associated with the Court's sprawling state sovereign immunity jurisprudence. Post, at 2055 - 2056 (citing, among others, Alden v. Maine, 527 U.S. 706, 814, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) (Souter, J., dissenting)).
As things stand, however, Seminole Tribe and its progeny remain the law. And so long as that is so, comity would be ill-served by unequal treatment of States and Tribes. If Tribes cannot sue States for commercial activities on tribal lands, the converse should also be true. Any other result would fail to respect the dignity of Indian Tribes.
B
The principal dissent contends that Tribes have emerged as particularly "substantial and successful" commercial actors. Post, at 2052. The dissent expresses concern that, although tribal leaders can be sued for prospective relief, ante, at 2035 (majority opinion), Tribes' purportedly growing coffers remain unexposed to *2043 broad damages liability. Post, at 2050 - 2051. These observations suffer from two flaws.
First, not all Tribes are engaged in highly lucrative commercial activity. Nearly half of federally recognized Tribes in the United States do not operate gaming facilities at all. A. Meister, Casino City's Indian Gaming Industry Report 28 (2009-2010 ed.) (noting that "only 237, or 42 percent, of the 564 federally recognized Native American tribes in the U.S. operate gaming").[2] And even among the Tribes that do, gaming revenue is far from uniform. As of 2009, fewer than 20% of Indian gaming facilities accounted for roughly 70% of the revenues from such facilities. Ibid. One must therefore *810 temper any impression that Tribes across the country have suddenly and uniformly found their treasuries filled with gaming revenue.
Second, even if all Tribes were equally successful in generating commercial revenues, that would not justify the commercial-activity exception urged by the principal dissent. For tribal gaming operations cannot be understood as mere profit-making ventures that are wholly separate from the Tribes' core governmental functions. A key goal of the Federal Government is to render Tribes more self-sufficient, and better positioned to fund their own sovereign functions, rather than relying on federal funding. 25 U.S.C. § 2702(1) (explaining that Congress' purpose in enacting IGRA was "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments"); see also Cohen's Handbook of Federal Indian Law 1357-1373 (2012) (Cohen's Handbook) (describing various types of federal financial assistance that Tribes receive). And tribal business operations are critical to the goals of tribal self-sufficiency because such enterprises in some cases "may be the only means by which a tribe can raise revenues," Struve, 36 Ariz. St. L. J., at 169. This is due in large part to the insuperable (and often state-imposed) barriers Tribes face in raising revenue through more traditional means.
For example, States have the power to tax certain individuals and companies based on Indian reservations, making it difficult for Tribes to raise revenue from those sources. See Oklahoma Tax Comm'n v. Citizen Band Potawatomi Tribe of Okla., 498 U.S. 505, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991) (allowing State to collect taxes on sales to non-Indians on Indian land); Arizona Dept. of Revenue v. Blaze Constr. Co ., 526 U.S. 32, 119 S.Ct. 957, 143 L.Ed.2d 27 (1999) (allowing taxation of companies owned by non-Indians on Indian land); Thomas v. Gay, 169 U.S. 264, 18 S.Ct. 340, 42 L.Ed. 740 (1898) (allowing taxation of property owned by non-Indians on Indian land). States may *811 also tax reservation land that Congress has authorized individuals to hold in fee, regardless of whether it is held by Indians or non-Indians. See Cass County v. Leech Lake Band of Chippewa Indians, 524 U.S. 103, 118 S.Ct. 1904, 141 L.Ed.2d 90 (1998) (States may tax Indian reservation land if Congress made the land subject to sale under the Indian General Allotment Act of 1887 (also known as the Dawes Act)); County of Yakima v. Confederated Tribes and Bands of Yakima Nation, 502 U.S. 251, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992) (same).
As commentators have observed, if Tribes were to impose their own taxes on *2044 these same sources, the resulting double taxation would discourage economic growth. Fletcher, In Pursuit of Tribal Economic Development as a Substitute for Reservation Tax Revenue, 80 N. D. L. Rev. 759, 771 (2004) ; see also Cowan, Double Taxation in Indian Country: Unpacking the Problem and Analyzing the Role of the Federal Government in Protecting Tribal Governmental Revenues, 2 Pittsburgh Tax Rev. 93, 95 (2005) ; Enterprise Zones, Hearings before the Subcommittee on Select Revenue Measures of the House Committee On Ways and Means, 102d Cong., 1st Sess., 234 (1991) (statement of Peterson Zah, President of the Navajo Nation) ("[D]ouble taxation interferes with our ability to encourage economic activity and to develop effective revenue generating tax programs. Many businesses may find it easier to avoid doing business on our reservations rather than ... bear the brunt of an added tax burden").
If non-Indians controlled only a small amount of property on Indian reservations, and if only a negligible amount of land was held in fee, the double-taxation concern might be less severe. But for many Tribes, that is not the case. History explains why this is so: Federal policies enacted in the late 19th and early 20th centuries rendered a devastating blow to tribal ownership. In 1887, Congress enacted the Dawes Act. 24 Stat. 388. That Act had two major components relevant here. First, it converted the property that *812 belonged to Indian Tribes into fee property, and allotted the land to individual Indians. Id., at 388-389. Much of this land passed quickly to non-Indian owners. Royster, The Legacy of Allotment, 27 Ariz. St. L. J. 1, 12 (1995). Indeed, by 1934, the amount of land that passed from Indian Tribes to non-Indians totaled 90 million acres. See Cohen's Handbook 74. Other property passed to non-Indians when destitute Indians found themselves unable to pay state taxes, resulting in sheriff's sales. Royster, supra, at 12.
A second component of the Dawes Act opened "surplus" land on Indian reservations to settlement by non-Indians. 24 Stat. 389-390. Selling surplus lands to non-Indians was part of a more general policy of forced assimilation. See Cohen's Handbook 75. Sixty million acres of land passed to non-Indian hands as a result of surplus programs. Royster, supra, at 13.[3]
These policies have left a devastating legacy, as the cases that have come before this Court demonstrate. We noted in Montana v. United States, 450 U.S. 544, 548, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), for example, that due in large part to the Dawes Act, 28% of the Crow Tribe's reservation in Montana was held in fee by non-Indians. Similarly, Justice White observed in Brendale v. Confederated Tribes and Bands of Yakima Nation, 492 U.S. 408, 414, 109 S.Ct. 2994, 106 L.Ed.2d 343 (1989) (plurality opinion), that 20% of the Yakima Nation's reservation was owned in fee. For reservations like those, it is particularly impactful that States and local governments may tax property held by non-Indians, Thomas, 169 U.S., at 264-265, 18 S.Ct. 340, and land held in fee as a result of the Dawes Act. See County of Yakima, 502 U.S., at 259, 112 S.Ct. 683.
Moreover, Tribes are largely unable to obtain substantial revenue by taxing tribal members who reside on non-fee land that was not allotted under the Dawes Act. As one scholar *813 recently observed, even if Tribes imposed high taxes on Indian residents, "there is very little income, property, *2045 or sales they could tax." Fletcher, supra, at 774. The poverty and unemployment rates on Indian reservations are significantly greater than the national average. See n. 4, infra . As a result, "there is no stable tax base on most reservations." Fletcher, supra, at 774; see Williams, Small Steps on the Long Road to Self-Sufficiency for Indian Nations: The Indian Tribal Governmental Tax Status Act of 1982, 22 Harv. J. Legis. 335, 385 (1985).
To be sure, poverty has decreased over the past few decades on reservations that have gaming activity. One recent study found that between 1990 and 2000, the presence of a tribal casino increased average per capita income by 7.4% and reduced the family poverty rate by 4.9 percentage points. Anderson, Tribal Casino Impacts on American Indians Well-Being: Evidence From Reservation-Level Census Data, 31 Contemporary Economic Policy 291, 298 (Apr. 2013). But even reservations that have gaming continue to experience significant poverty, especially relative to the national average. See id., at 296. The same is true of Indian reservations more generally.[4]
Both history and proper respect for tribal sovereignty-or comity-counsel against creating a special "commercial activity" exception to tribal sovereign immunity. For these reasons, and for the important reasons of stare decisis and *814 deference to Congress outlined in the majority opinion, I concur.