**Morris H. KRAMER, Plaintiff,**

**v.**

**UNION FREE SCHOOL DISTRICT NO. 15, Raymond S. Baron, Jesse Cestari, Ralph J. Edsel, J. Gibson Fruin, Hardon Deixel, Elliot A. Norwalk, and Harold S. Rosenfeld, Defendants.**

**No. 31105.**

United States District Court
E. D. New York.

Jan. 30, 1968.

2. Ellison v. United States, 93 U.S.App.D.C. 1, 206 F.2d 476, 478 (1953).

Murray A. Miller, New York City (Bradley B. Davis, New York City, on the brief), for plaintiff.

John P. Jehu, Albany, N. Y., for defendants.

Daniel M. Cohen, Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen., of the State of New York, New York City, of counsel), for the State of New York, intervenor.

Before MOORE, Circuit Judge, and BARTELS and WEINSTEIN, District Judges.

MOORE, Circuit Judge.

This is a class action in which plaintiff seeks to have a state statute declared unconstitutional and its enforcement enjoined. The complaint, asserting federal jurisdiction under 42 U.S.C. §§ 1981 and 1983 and 28 U.S.C., is brought on behalf of plaintiff and others similarly situated to have this court declare § 2012 of the New York Education Law, McKinney's Consol.Laws, c.[1] unconstitutional because it denies them equal protection of the laws and a republican form of government in violation of the Fourteenth Amendment and Article 4, Section 4 of the Federal Constitution. More specific-

ally, he requests that a judgment be entered declaring § 2012 to be unconstitutional, that a permanent injunction be issued against defendants from enforcing said Section; and that defendants submit a plan whereby plaintiff and others similarly situated be allowed to register in future school board elections.

The defendants are the Union Free School District No. 15, Cedarhurst, New York, and members of the Board of Education thereof.

The facts alleged in substance are:

Plaintiff, Morris H. Kramer, a college graduate, is a twenty-eight-year-old bachelor who resides in the private home of his parents located in Atlantic Beach, New York, within the confines of District No. 15. He has lived with his parents for many years, and he has voted in federal and state elections since 1959. He is not a property owner, a lessee or a parent with school-age children. On April 25, 1965, he attempted to register in the forthcoming school district election, but his application was rejected by defendants on the ground that he failed to meet the special voter qualifications set forth in Section 2012.

On March 4, 1966, defendants moved to dismiss the complaint (1) for lack of subject matter jurisdiction, and (2) for failure to state a claim. On March 17, 1966, plaintiff moved to convene a three-

---

1. Section 2012, Education Law of New York State:

"§ 2012. Qualifications of voters at district meetings

A person shall be entitled to vote at any school meeting for the election of school district officers, and upon all other matters which may be brought before such meeting, who is:
1. A citizen of the United States.
2. Twenty-one years of age.
3. A resident within the district for a period of thirty days next preceding the meeting at which he offers to vote; and who in addition thereto possesses one of the following three qualifications:
a. Owns or is the spouse of an owner, leases, hires, or is in the possession under a contract of purchase of, real property in such district liable

to taxation for school purposes, but the occupation of real property by a person as lodger or boarder shall not entitle such person to vote, or
b. Is the parent of a child of school age, provided such a child shall have attended the district school in the district in which the meeting is held for a period of at least eight weeks during the year preceding such school meeting, or
c. Not being the parent, has permanently residing with him a child of school age who shall have attended the district school for a period of at least eight weeks during the year preceding such meeting.
No person shall be deemed to be ineligible to vote at any such meeting, by reason of sex, who has the other qualifications required by this section."

judge court to hear and determine the alleged constitutional issue.

The district court denied the motion to convene a three-judge court and granted defendants' motion, dismissing the complaint on the merits, 259 F.Supp. 164, E.D.N.Y. A petition for a writ of mandamus to direct the convocation of a three-judge court was denied by the Supreme Court sub nom. Davis v. Union Free School District No. 7, 385 U.S. 807, 87 S.Ct. 172, 17 L.Ed.2d 121 (1966).

On appeal to the Court of Appeals, the Court in three separate opinions, one a dissenting opinion, reversed and remanded, 379 F.2d 491 (1967). Judge Hays in his opinion held that there was "a constitutional claim of sufficient substance to require that a three-judge court be convoked." Judge Kaufman concurred because he could not "conclude that appellant's challenge to § 2012 of the New York State Education Law is 'insubstantial' " but warned against any inference therefrom that he viewed "appellant's claim as being meritorious." (p. 495). Chief Judge Lumbard dissented on the ground that the claim was "so patently without any merit" and that the constitutional issues were "insubstantial".

As a result of the remand by the Court of Appeals, the responsibility of this three-judge court is to hear and determine whether Section 2012 is unconstitutional. Such hearing has been held, and the parties have submitted by reference the briefs in the case before the Court of Appeals as well as supplementary briefs.

Less than one-third of the local school systems in the State of New York are organized as Union Free School Districts under the statute which nevertheless represents a statewide policy.[2] The voters in such districts who have qualified under § 2012 may attend the district meetings which are held at least once a year. (N.Y. Education Law § 2002). At such a meeting they approve the school budget and vote to levy the taxes on taxable real property in the school district necessary to meet the expenses for the coming year. See N.Y. Education Law §§ 2021, 2022. The voters in each school district also elect from their number three to nine Trustees who act as the Board of Education. See N.Y. Education Law §§ 1701, 2101(2), 1702. The Board of Education is the body which prescribes the course of study to be followed in the district schools, decides on the text-books, purchases or builds schools (when authorized at a meeting), hires teachers, and makes other educational policy decisions. See N.Y. Education Law § 1709. While the Board of Education generally cannot spend more money than is appropriated at the district meeting (§ 1718), it has the sole power to set teachers' salaries (§ 2022) and it can pay teacher salaries and "ordinary contingent expenses" even if the voters neglect or refuse to appropriate money to cover the same. (§ 2023). Additional funds to cover the cost of operating the district school systems may be received from the federal and state governments.

▇ In making this attack the plaintiff in addition seeks to invalidate the statute upon the ground that it also denies voting rights to others not in his class. Although such expanded representation would not strengthen his claim, it is appropriate to point out that plaintiff is not in a position, either individually or by his class action, to represent members of other classes not similarly situated. "Ordinarily, one may not claim standing in this Court to vindicate the constitutional rights of some third party. Reference to this rule is made in varied situations" (Barrows v. Jackson, 346 U.S. 249, 255, 73 S.Ct. 1031, 1034, 97 L.Ed. 1586 (1953)); Mapp v. Board of Education of City of Chattanooga, Tenn., 319 F.2d 571 (6 Cir. 1963); Thaxton v.

---

2. Section 2012 is not applicable to city school districts in New York, Buffalo, Rochester, Syracuse, Yonkers and Albany and in cities with less than 125,000 population. In those cases the Board is appointed by the Mayor and/or Council (New York Education Law §§ 2531, 2553 (2)) and the population of those districts exceeds two-thirds of the population of the state.

Vaughan, 321 F.2d 474 (4 Cir. 1963); 3A Moore's Federal Practice § 23.07(2) at 3427 (2d Ed. 1967); see also, Hamer v. Campbell, 358 F.2d 215 (5 Cir. 1966); Nesbit v. Statesville City Board of Education, 232 F.Supp. 288 (W.D.N.C.1964), decision vacated, 345 F.2d 333 (4 Cir. 1965); Carroll v. Associated Musicians of Greater New York, 316 F.2d 574 (2 Cir. 1963).

The Legislature of the State of New York, in the statute here under attack, has limited the franchise in Union Free School District elections to those district residents who, it believes, have a direct interest in the administration of the school system because they are either real estate taxpayers (or renters of taxable real estate) and thus carry the burden of paying for a major share of the services provided by the school districts, or because they are directly involved as parents of pupils attending the schools in question. Specifically, three groups are enfranchised by § 2012:

(a) School district residents who own taxable real property, and their spouses,

(b) School district lessees, but not their spouses,

(c) Parents or guardians of children attending district schools.

Among the groups not enfranchised by the statute are adults such as plaintiff who reside in family homes. (See also § 2012(3) (a): "the occupation of real property by a person as lodger or boarder shall not entitle such person to vote.") Plaintiff argues that this is a discrimination based on property or wealth and as such is a denial of equal protection of the laws in violation of the Fourteenth Amendment.

Plaintiff places much emphasis on Harper v. Virginia Board of Education, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), in which the United States Supreme Court held Virginia's poll tax to be unconstitutional. In broad terms the Court stated that "it is enough to say that once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment." (383 U.S. at 665, 86 S.Ct. at 1081). The Court also there said: "we conclude that a State violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or payment of any fee an electoral standard. Voter qualifications have no relation to wealth nor to paying or not paying this or any other tax. * * * the interest of the State, when it comes to voting, is limited to the power to fix qualifications. Wealth, like race, creed, or color, is not germane to one's ability to participate intelligently in the electoral process." (383 U.S. at 666, 668, 86 S.Ct. at 1081).

Thus, the Court, while conceding a State's power to fix voter qualifications, held that wealth was not a proper standard for qualification in general elections. Of a similar character is the recent New York Court of Appeals decision in Landes v. Town of North Hempstead, 20 N.Y.2d 417, 284 N.Y.S.2d 441, 231 N.E.2d 120 (1967). There the plaintiff, a duly designated nominee of the Democratic party for the office of councilman, brought the action to have declared unconstitutional sections of the New York Town Law which required a holder of an elective town office to be an owner of record of real property within the town. The plaintiff did not then own property, having transferred title to his home to his wife. The court held the statute unconstitutional because it found that insofar as over-all town government was concerned, the property qualification was unrealistic and "that it is impossible today to find any rational connection between qualifications for administering town affairs and ownership of real property." The court recognized that a large proportion of the population in many towns, especially in suburban areas, are apartment house dwellers and that such a statute would make ineligible for the position of councilman an otherwise well qualified candidate merely because real property was not registered in his name.

All parties are in accord that statutes passed by a state legislature carry with them a presumption of validity, and that the classifications made in such enactments will not be struck down unless they make invidious discriminations, are patently arbitrary or are irrelevant to the achievement of the state's objective, Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965); McGowan v. State of Maryland, 366 U.S. 420, 425, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); Lassiter v. Northampton County Board of Elections, 360 U.S. 45, 50–51, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959); Allied Stores of Ohio, Inc. v. Bowers, 358 U.S. 522, 527, 79 S.Ct. 437, 3 L.Ed.2d 480 (1959). The defendants argue that it is not unreasonable for the legislature to determine that the local school system should be run by those who have a direct interest in it, namely, those who have to pay for it and those who benefit from its services. We are of the opinion that this argument is well taken when applied to the narrow issue before us—the denial of the franchise to those school district residents whose interest in educational policy and the financing thereof is at best indirect and weak, compared to the concern of those who are franchised.

The Supreme Court in *Harper* has held, in effect, that everybody is affected by, and directly interested in, a general election; both the rich and the poor should have an opportunity to vote for those who will govern them. In Landes v. Town of North Hempstead, supra, the New York Court of Appeals has said that property considerations should not control elections for councilman, because the decisions reached by those bodies (despite the "local" nature of the issues) directly affect all the residents of the village. However, it is not inconsistent with this principle to hold that the states may require those seeking to vote on school policy to have a direct interest or stake in the issues to be decided and to exclude those who do not. Plaintiff has not indicated that any decisions reached by those assembled at the district meeting or by the Board of Education for the district will affect him in any way. His argument is that the vote is given to owners and lessees of property; ergo, it must be given to him as well. This argument fails to take into consideration the difference between the situations before the courts in *Harper* (a general state election) and *Landes* (a general town election) and the situation before this court (a school district election). The latter is a local election on limited issues as to which certain local residents have a far greater direct interest than others.[3] The Supreme Court has recently noted that a school board "performs essentially administrative functions; and while they are important, they are not legislative in the classical sense." Sailors v. Board of Education of the County of Kent, 387 U.S. 105, 110, 87 S.Ct. 1549, 1553, 18 L.Ed.2d 650 (1967). The difference in the type of election involved makes the voter qualifications of § 2012 "rational" and within the limits of the State's power to fix them.

The quality of public education is controlled in large part by the personal interest of those members of the community who are most vitally affected thereby. The group most interested should be the parents. The effective participation by their offspring in coping with the problems of the next generation will be influenced by the strength of their educational foundation. Good education, however, is more than a metaphysical concept; it must be implemented, particularly in this age of rapidly expanding technology, in all fields, with modern buildings and faculty. The geographic areas in which the Section 2012 school districts function differ substantially from those of the large cities where there are no Board of Education elections. In the smaller communities, there should be found a greater identity of interest with education on the part of the parent and tax-

3. Property ownership, it should be noted, is only one of several alternative conditions which the Legislature has chosen as indicia of direct interest in the local school system.

payer groups, the parents because of their supervision over their children, and the taxpayers because of their responsibility for the school capital and operating budgets. Persons in plaintiff's category obviously do not have the same permanency of attachment or interest in the school district as those in the other categories.

■ It is suggested in support of plaintiff's claim, that the court take judicial notice of certain background conditions, social, political and economic, including the impact of the Board's fiscal decisions upon the price of goods and services and certain non-property taxes, all of which it is alleged indirectly affect plaintiff.[4] Apart from the questionable propriety of taking judicial notice of some of these vague generalizations, those factors only suggest possible effects which peripheral activities of the school system might have on plaintiff. However, schools are erected and operated primarily for the education of children, and parents and those closely allied to the community by leases or property ownership are obviously the most interested and affected. The right of suffrage may be limited where the rationale of the exclusion is so directly related to the objective to be achieved. See Lassiter v. Northampton County Bd. of Elections, 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959); Pope v. Williams, 193 U.S. 621, 24 S.Ct. 573, 48 L.Ed. 817 (1904). Therefore, the Legislature, in acting within its power to fix voter qualifications, did not discriminate in an unreasonable or unrealistic manner. Quite to the contrary, the selection of the parent and taxpayer groups definitely would appear to be within the permissive limits of power still preserved by state legislatures as specified both by the Supreme Court and the New York Court of Appeals.

■ Plaintiff's reliance on the Guaranty Clause is without merit as it does not present a justiciable issue. See Baker v. Carr, 369 U.S. 186, 222–229, 82 S. Ct. 691, 7 L.Ed.2d 663 (1962).

Complaint dismissed.

WEINSTEIN, District Judge (dissenting).

Section 2012 of the New York Education Law permits the great majority of adult citizens—resident property holders and lessees of apartments and parents of children attending the district's schools —to vote in elections of Union Free School Districts. Disenfranchised by the statute are the following groups of otherwise qualified voters:

1. young adults such as plaintiff residing in family homes;
2. boarders and lodgers;
3. elder citizens and others living in the homes of their children or other relatives;
4. spouses of persons renting homes;
5. parents not owning or renting homes whose children attend private or parochial schools;
6. parents, not owning or renting homes, whose children attend special public schools outside the district;
7. parents, not owning or renting homes, whose children are too young or too old to attend public schools; and
8. clergy, military, and others living on tax exempt property.

The state's defense of section 2012 is predicated on the hypothesis that if a person neither has an offspring who attends public school nor pays a school tax, he does not possess an interest in school board elections sufficient to entitle him

4. "But a Constitution is not intended to embody a particular economic theory, whether of paternalism and the organic relation of the citizen to the state or of *laissez faire*" (Lochner v. State of New York, 198 U.S. 45, 76, 25 S.Ct. 539, 547, 49 L.Ed. 937 (1905)) and the payment of non-property local taxes or other indirect taxes affords plaintiff no standing to attack the statute or any basis for a voice in the election of members of the school board. Doremus v. Board of Education, 342 U.S. 429, 433, 72 S.Ct. 394, 96 L.Ed. 475 (1952); Thomas v. Gay, 169 U.S. 264, 276, 18 S.Ct. 340, 42 L.Ed. 740 (1898).

to vote. The state's assumption is unacceptable. An important characteristic of our political system is the diffusion of power among various levels of government. Local school boards exercise a very considerable portion of that power in suburban communities. Thus, a citizen excluded from participation in control of this locus of governmental force is deprived of a significant degree of control over the total government of this nation. Accordingly, pursuant to the mandate of the Equal Protection Clause of the Fourteenth Amendment, the motion to dismiss should be denied. Alternate grounds for sustaining the complaint are that it states a valid claim under the First Amendment and under the New York State Constitution.

The facts alleged must be construed in light of the social, political, and economic milieu in which the challenged statute operates. While these background conditions are not mentioned in the complaint, on a motion to dismiss for failure to state a cause of action, a court must give the pleader every reasonable benefit of potential proof and plausible inference. Its power—and its obligation—to take judicial notice is necessarily broad. This heightened sensitivity to the realities of our society is particularly important in a case involving public issues and claims of constitutional deprivation.

## I. SIGNIFICANCE OF LOCAL SCHOOL BOARD ELECTIONS

An analysis of the role of education in America, particularly in the communities where section 2012 applies, demonstrates the great importance of the right asserted by plaintiff. Disallowance of the franchise in school board elections is a denial of equal power to control the expenditure of a major portion of locally raised funds and a substantial amount of state and federal money; it is a refusal of a voice in the administration of adult education, recreation, library, and cultural enrichment programs which play an important role in the daily lives of citizens of voting age; it is a preclusion of effective participation in the decisions which determine the character and quality of the local community. It is, in short, a deprivation of one of the basic incidents of citizenship.

A. *Importance of Education in a Democratic Society*

An educational system constitutes a modern society's crucial genes. By shaping the minds and attitudes of the young, it determines their individual and collective future. Only through excellent schools and teachers can a democracy such as ours achieve the equality of opportunity and the informed electorate vital to its existence. In this country, the concern with education manifests itself in the expenditure of large sums of public and private money, the strong feelings of our citizens about current educational issues, and the studied attempts to preserve local control.

Last year the total expenditure on education in United States public and private schools was over fifty billion dollars, about seven percent of our gross national product. Approximately thirty billion dollars was spent for primary and secondary education in public schools. When the time of enrolled students, who number almost sixty million, is considered, education is clearly the predominant constructive activity of this nation.

Headlines daily furnish examples of the deep passions stirred by debate on control of educational policy. One of the substantial pressures on peaceful race relations has come from the problems created by integration of schools. In the North as well as the South, people have at times abandoned the ballot and the courts and taken to the streets in an attempt to settle these problems. Denial of the right to vote in school board elections is a denial of the right to participate in attempts at controlling deep currents in our society which can nurture or destroy.

Control of American education remains primarily in local hands. Demands for further decentralization are being pressed. See, e. g., Report of the Mayor's Advisory Panel on Decentralization of the New York City Schools ["Bundy Re-

port"] (1967); Buder, Demands for Local Control Grow, New York Times, Jan. 12, 1968, p. 49, col. 4; M. Gittell, Saving City Schools, LVII National Civic Review 21 (1968).

## B. *Importance of Education in Suburban Communities*

Nowhere in the United States is greater significance attached to education than in the suburban communities in which section 2012 applies. The recent exodus from city to suburb has been due in large measure to the desire of parents to see their children educated in the best possible schools. At the very least, the quality of these schools has been a consideration weighed heavily by those who must choose in which suburb to settle. A striking example of the effect that a school system can have on a community was given by counsel for defendants on oral argument. He cited a recent incident in which a large industrial plant was established in Pennsylvania rather than in New York State because management personnel, scientists, and technicians were unwilling to subject their children to the inferior educational system available at the proposed New York site.

Moreover, in suburbia the local school system is a focal point for the political energies of the adult population. In an increasingly complex mass society, a local school board election may provide the major outlet for the political drives of residents who see in it an opportunity for effective, tangible and meaningful political action. Even on state and national political issues the suburban schools are of great importance, for it is in the school buildings that many of the debates and meetings are held.

Together with adult education programs, concerts, and theatre presentations held in the schools, such political discourse constitutes an important part of intellectual life outside our major cities. The local school board, by encouraging or discouraging use of school buildings for these purposes can have a significant effect on the adult community's intellectual and political characteristics.

## C. *Importance of Cost of Education to Plaintiff*

The amount of money spent annually on education by both the private and public sectors of our economy is steadily increasing. The decisions reached by local school boards have an impact on the fiscal decisions of every level of government. Denial of the right to vote for school boards which administer these funds deprives plaintiff—a federal, state and county taxpayer—of the degree of control over the expenditure of this tax money enjoyed by those entitled to vote on school matters.

The federal government is involved in poverty programs like "Head Start," which are administered by local communities, in National Defense Education Act and other loan programs, and in direct aid to state and local school systems. Federal participation in programs of the Department of Health, Education and Welfare (H.E.W.) aiding education amounted to almost four billion dollars last year. An additional nine and one-half billion dollars was allocated by the 90th Congress to fund H.E.W. programs designed to aid education over the next two years.

The state is also a major source of funds for local schools. In his 1968 budget message to the New York Legislature, the Governor of New York summarized the scope and impact of state aid to local schools as follows:

"With the increases I propose, total aid to local communities to help pay the cost of primary and secondary education will amount to about $1.8 billion—approximately 36 per cent of the current revenue anticipated by the state in the 1968–69 fiscal year. The added aid included in my budget for primary and secondary education will consume more than 58 per cent of the revenue expected from the tax increases that I propose, and be a *significant factor in helping to hold down local property taxes.*" (Emphasis supplied.)

The fact that a citizen does not pay local school property taxes does not mean that he is not affected by school budgets. In the first place, the level of taxation in a local community influences the price of goods and services. In the second, as school taxes based on property increase, so do the pressures to reduce property taxes levied by the village, town, and county. Thus, decisions on school budgets can have a major impact on the administration of the other local units of governments which affect the daily lives of citizens like plaintiff. Finally, the structure of local government mandates that it is the county, towns and villages which bear the responsibility for much of the expense attributable to school district activities.

A study of the current budget for Nassau County, in which plaintiff resides, is instructive. School real estate taxes are based on property assessments by the County Board of Assessors, whose expenses are paid from County taxes. Town Receivers of Taxes, whose staffs are paid from town taxes, collect school district taxes. For 1967–68, these school taxes amounted to over two hundred and thirty-eight million dollars. Together with the costs of collecting the taxes and other county government expenses for education—maintenance of a vocational educational program and a community college—these sums amount to fifty-two percent of all the monies raised in Nassau County from real property taxes.

County government tax revenues are partly based upon non-property taxes—including special taxes on pari-mutuel betting, permit and license fees, fines and forfeitures, and departmental revenues (and sales taxes in some parts of the state). These non-property local taxes which help support local education are paid by plaintiff and citizens similarly situated. Moreover, zoning and the construction of roads, parks and other county, town and village facilities are influenced by the location and design of local schools.

### D. Importance of Non-Fiscal Aspects of Educational System to Plaintiff

Since the school system is at the center of the social, cultural and recreational life of a suburban community, it is not difficult to understand its effect on plaintiff. Adult education programs, financed out of federal, state and local funds and controlled by local school boards, can provide a major source of intellectual stimulation and an opportunity for self-improvement or they may be dull and valueless. In Great Neck, a community in Nassau County, for example, the 1968 spring catalogue of the local school district lists over one hundred and fifty adult education courses ranging from "Adult Guidance Testing Workshop" to "Yoga."

Libraries, whose appropriations can be governed by the same electorate which votes in school board elections (N.Y. Education Law § 255), may contain the books that appeal to citizens like plaintiff or they may be little more than children's reading rooms. School funds may be spent on swimming pools and playing fields available to members of the adult community or on textbooks and teachers' salaries. The schools may provide concerts, guest speakers, and dramatic performances or they may be silent during non-school hours. A denial of the right to vote in school board elections is a denial of the right to participate in decisions on issues which can give meaning and satisfaction to the lives of citizens like plaintiff.

## II. APPLICABLE LAW

### A. Rights Under the Federal Constitution

#### 1. Equal Protection Grounds

The validity of section 2012 must be measured by the standards of the Equal Protection Clause. In voting rights cases the rule to be gleaned from the decisions is this: the right to vote on important governmental issues may not be denied to a citizen with intellectual and moral capacity who meets prescribed reasonable age and residence requirements.

School boards need not be elective. Sailors v. Board of Educ., 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967). But this does not mean that the state is free to select any standards it chooses in granting the vote where the board is elected. As Judge Hays pointed out in remanding this case to be heard by a three-judge court:

> "[T]he Supreme Court has held, 'once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment. Harper v. Virginia Board of Elections, 383 U.S. 663, 665, 86 S.Ct. 1079, 1081, 16 L.Ed.2d 169 (1966).' " Kramer v. Union Free School Dist. No. 15, 379 F. 2d 491, 494 (2d Cir. 1967).

We need not, in this case, decide whether a school board of a New York Union Free School District exercises "legislative" or "executive" powers. In apportionment cases this characteristic seems, for the moment, to be a factor relied upon by the Supreme Court in deciding whether an election is required. Sailors v. Board of Educ., 387 U.S. 105, 109, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967); Sentell, Reapportionment and Local Government, 1 Georgia L.Rev. 596, 643 (1967). The distinction has no validity where an important office is filled by a public election and the issue is whether some citizens shall be denied the right to vote. See Sailors v. Board of Educ., 387 U.S. 105, 109, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967) ("since the choice of members of the county school board did not involve an election * * *, the principle of 'one man-one vote' has no relevancy"); Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963). Cf. Strickland v. Burns, 256 F.Supp. 824 (M.D.Tenn.1966) (election of county school commissioners from malapportioned districts unconstitutional); Delozier v. Tyrone Area School Board, 247 F.Supp. 30 (W.D.Pa.1965) (unconstitutional for directors of school board to be elected from regions with wide disparities in population). See also Pitts v.

Kunsman, 251 F.Supp. 962 (E.D.Pa. 1966) (as a matter of statutory interpretation, the composition of an interim school board on a basis other than proportional to district population was improper).

There can be no doubt that the "Equal Protection Clause * * * restrains the states from fixing voter qualifications which invidiously discriminate." Harper v. Virginia State Board of Elections, 383 U.S. 663, 666, 86 S.Ct. 1079, 1081, 16 L. Ed.2d 169 (1966); Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965). The question is whether the objectives of section 2012 and its method of achieving them should be classified as permissible "rational classifications" or as unconstitutional "invidious discriminations."

**(a) Standards in Voting Rights Cases**

States may make reasonable distinctions among their citizens. But their power is greatly circumscribed where the right to vote is involved. Any "alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." Reynolds v. Sims, 377 U.S. 533, 562, 84 S.Ct. 1362, 1381, 12 L.Ed.2d 506 (1964). "Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right." Wesberry v. Sanders, 376 U.S. 1, 17–18, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964).

In the field of voting, there is no merit to respondent's contention that qualifications are reasonable if they "rest on real and not feigned differences," and "the distinction have some relevance to the purposes for which the classification is made." Walters v. City of St. Louis, 347 U.S. 231, 237, 74 S.Ct. 505, 509, 98 L.Ed. 660 (1954) (validity of classification in a city income tax scheme). See also McGowan v. State of Maryland, 366 U.S. 420, 425–426 (1961) (validity of Sunday closing law).

The traditional test for determining whether a classification is valid under the Equal Protection Clause—rationality —does not satisfy the requirements of

the Clause where the right to vote is concerned. The central importance of this right in our political system recently led the Supreme Court to conclude that "a clearly rational state policy" of apportionment is unconstitutional if "population is submerged as the controlling consideration" in apportionment. Reynolds v. Sims, 377 U.S. at 581, 84 S.Ct. at 1392. Such considerations as history, economic or group interests, geography, desire to insure effective representation for sparsely settled areas, accessibility of representatives to their constituents, theories of bicameralism, occupation, balance of urban and rural power, and results of a popular referendum were all rejected as inconsistent with the equal protection requirement of one person-one vote. Reynolds v. Sims, 377 U.S. at 622–623, 84 S.Ct. 1362, 12 L.Ed.2d 506 (Harlan, J. dissenting).

In dictum the reapportionment decisions have disclaimed the applicability of their strictures to the fixing of voter qualifications. See, e. g., Gray v. Sanders, 372 U.S. 368, 380–381, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963) ("Minor felons and other classes may be excluded * * *. But once the class of voters is chosen and their qualifications specified we see no constitutional way in which equality of voting power may be evaded."). But their rationale mandates application of stringent standards in testing the reasonableness of limitations on the franchise. The assumption underlying the reapportionment decisions is that because the right to vote could not be totally denied on the basis of the rational considerations advanced by the states, it could not be even partially denied or diluted on such bases. See Reynolds v. Sims, 377 U.S. 533, 562, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) ("It could hardly be gainsaid that a constitutional claim had been asserted by an allegation that otherwise qualified voters had been entirely prohibited from voting"). Thus, denial of the right to vote entirely represents an *a fortiori* case of dilution of the vote. See Harper v. Virginia St. Bd. of Elections, 383 U.S. 663, 668, 86 S.Ct. 1079,

16 L.Ed.2d 169 (1966) ("The principle that denies the State the right to dilute a citizen's vote on account of his economic status or other such factors by analogy bars a system which excludes those unable to pay a fee to vote").

It is not quite accurate to say that "rationality is no longer the test in voting cases." Any state enactment which is not rational cannot be sustained. But raw logic does not support restrictions on the right to vote. Some premises are no longer constitutionally permissible and legal syllogisms which embody them must be rejected. One constitutionally unacceptable hypothesis is that people owning rights to real property are more likely than citizens generally to exercise their vote responsibly. Thus, a local policy based on the assumption that owners of property rights are particularly interested in school elections cannot justify denying the right to vote to other morally and intellectually qualified adults who meet residence requirements.

In two recent cases invalidating state qualifications for voting, the Supreme Court has, in practice, accepted more stringent limitations on state power than afforded by the "any rational purpose" test. Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965); Harper v. Virginia St. Bd. of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966).

Striking down a provision in the Texas Constitution preventing "[a]ny member of the Armed Forces of the United States" who moved to Texas during military service from voting in any election in the State "so long as he or she is a member of the Armed Forces," the Court rejected the justifications offered —that persons in military service were always subject to reassignment and therefore could not be deemed to be bona fide residents and that there was a danger that the concentrated ballots of military personnel might overwhelm a small civilian community. Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L. Ed.2d 675 (1965). The danger of military domination of local elections was an

unacceptable reason for denying the vote to otherwise qualified voters who were members of the Armed Forces because "fear of the political views of a particular group of bona fide residents," cannot be used to deprive them of their right to vote. 380 U.S. at 94, 85 S.Ct. at 779. Although acknowledging that "Texas has the right to require that all military personnel enrolled to vote be bona fide residents of the community," the Court ruled that because some servicemen could in fact acquire bona fide residence while stationed in Texas, the State must "winnow * * * from the ranks of the military those whose residence * * * is bona fide * * *. States may not casually deprive a class of individuals of the vote because of some remote administrative benefit." 380 U.S. at 95, 96, 85 S.Ct. at 780.

The Court clearly rejected the standard of "any rational purpose" advanced by the defendants in the instant case. As Mr. Justice Harlan's dissent points out, "Texas could rationally conclude" that instances in which military men were residents "would likely be too minimal to justify the administrative expenditure involved" in winnowing them out from the vast majority who were transients. 380 U.S. at 99–100, 85 S.Ct. 775, 782. If the State need only produce "any state of facts [which] reasonably may be conceived to justify" the classification (McGowan v. Maryland, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1960)) in order to satisfy the Equal Protection Clause, the Texas provision would have been valid.

In Harper v. Virginia St. Bd. of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), the Court declared invalid Virginia's poll tax on the ground that "wealth * * * has * * * no relation to voting qualifications." 383 U.S. at 670, 86 S.Ct. at 1083. It held that "a State violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or payment of any fee an electoral standard." Id. at 666, 86 S.Ct. at 1081.

The dissents of Justices Black and Harlan in *Harper* both persuasively argue that the poll tax could be supported as having a rational basis—the historical belief that those who pay poll taxes are more interested in furthering the State's welfare. But the majority rejected this claim, noting:

"[w]e have long been mindful that where fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined." Id. at 670, 86 S.Ct. at 1083.

What showing will support a classification denying the right to vote is unsettled. *Harper* makes any property or wealth qualifications for voting unconstitutional. *Carrington* outlaws a denial of the vote based on fear of the political persuasion of those denied the right and prevents a state from striking a balance against voting rights in favor of administrative convenience. Together with the reapportionment cases, these two cases make it clear that equal protection requires a higher standard for classifications denying or diluting a citizen's vote than has traditionally been required for legislative classifications involving less fundamental political matters.

*Lassiter* v. *Northampton Cty. Bd. of Elections* (360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959)) upheld a non-discriminatory literacy test for voting. But see Cardona v. Power, 384 U.S. 672, 675, 86 S.Ct. 1728, 16 L.Ed.2d 848 (1966) (Douglas, J. dissenting) (constitutionality of a fairly administered literacy test question). *Lassiter* is explicable on the ground that the excluded voters lacked intellectual capacity. This rationale has no bearing on the case before us —plaintiff is a college graduate; here discriminations are based upon whether the voter has property rights or has children attending public schools—criteria having no bearing on intellectual or moral qualifications as a voter. The

Supreme Court made it quite clear in *Harper* that:

> "Wealth, like race, creed or color, is not germane to one's ability to participate intelligently in the electoral process. Lines drawn on the basis of property, like those of race * * * are traditionally disfavored." 383 U.S. at 668, 86 S.Ct. at 1082.

### (b) *Standards Applied to § 2012*

#### (i) *Clearly Arbitrary Distinctions*

We need not go beyond the confines of the standards already articulated in the decided cases to find a number of arbitrary and constitutionally indefensible distinctions made by section 2012. Taking first the case of the plaintiff himself—a childless adult—the statute is in direct conflict with the dictate of *Harper* that "wealth * * * has * * no relation to voting qualifications," for among the class of all non-parents the statute discriminates between those who own or rent property and those who do not.

Whatever doubt there might be that section 2012 imposes a forbidden property qualification for voting is resolved by an examination of the history of the statute. Originally, section 2012 and its predecessors required the ownership of property and the payment of school taxes as a condition precedent to voting. Periodically, new groups have been given rights to vote in school board elections. Thus, in 1867, parents of school children were given the vote. Cf. West, The Political Economy of American Public School Legislation, X Journal of Law and Economics 101, 119–120 (1967) (in 1867 compulsory financial contributions to public school costs by parents of students in rural schools were continued while city public schools were completely financed from taxes—an indication of the fiscal roots of the right of parents to vote provided in present section 2012). In 1894, a person in possession under a contract of purchase was given the vote. And in 1956, spouses of property holders were given the vote. The most significant addition to the group of citizens allowed to vote in school board elections was the recent inclusion of renters of residential property. The theory behind this amendment was that inasmuch as renters ultimately paid for school taxes in the form of higher rent, they had an interest almost the same as homeowners and, therefore, could not be denied the vote. Thus, the addition was nothing more than the recognition that in modern society for many purposes the apartment dweller occupies the same place as the homeowner. Cf. Landes v. Town of North Hempstead, 20 N.Y.2d 417, 421, 284 N.Y.S.2d 441, 444, 231 N.E.2d 120 (1967). The statute clearly sets up a property qualification for voting. This is a denial of equal protection.

This same reasoning applies with equal force not only to young adults living with their parents, but to older persons residing with their children, to boarders or lodgers, and to clergy, military, and others living on tax exempt property. Assuming persons in each of the groups mentioned do not have children attending district schools, the only line separating these non-parents from the non-parents entitled to vote is the line of property. If you own or rent property you vote, if you do not, you do not vote.

Such discrimination cannot be justified by arguing that the requirement of owning or renting is designed to enfranchise those with a sufficiently stable interest in community affairs to be expected to exercise the ballot responsibly. Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965). As Chief Judge Fuld, speaking for the New York Court of Appeals in a decision striking down an analogous state law requiring the ownership of property as prerequisite to holding local office, so eloquently put it:

> "Ownership of real property does not render one more interested in, or devoted to, the concerns of the town. In a society such as ours, characterized by its 'mobility' and 'anonymity' (Cox, The Secular City [rev. ed., 1966], p. 33), a landowner is no more

likely to be permanently established in a town—and, by that token, better qualified to govern—than one who is not a property owner. Examples come readily to mind which demonstrate the unrealistic character of the property qualification: an elected town councilman, suddenly compelled by financial reverses to sell his home and move into an apartment, would be required to resign from office; an apartment dweller who owned a taxpayer in town but who commuted to his place of business in, for instance, New York City and took no interest or part in civic affairs would be fully eligible for town office; and an apartment dweller not owning real property but with a place of business in town and deeply involved in community affairs would be ineligible. All in all, we suggest that it is impossible today to find any rational connection between qualifications for administering town affairs and ownership of real property." Landes v. Town of North Hempstead, 20 N.Y.2d 417, 421, 284 N.Y.S.2d 441, 444, 231 N.E.2d 120, 122 (1967).

The grant of the right to vote to spouses of property owners but not to spouses of property renters is an invidious discrimination with no justification. The statute recognizes that apartment dwellers and homeowners have virtually identical interests in the outcome of school board elections but does not recognize that spouses of apartment dwellers have the same stake in the outcome of the elections as spouses of homeowners. The discrimination is easily circumvented—all that need be done is to have both husband and wife sign the lease and both are then entitled to vote under the statute. But the fact that the provision is little more than a trap for the unwary does not provide constitutional justification.

Taking next the class of all non-property holders who are parents, the statute again makes constitutionally impermissible distinctions. The statute disenfranchises parents whose reason for sending their children to private schools is that the public schools are inferior;

they may have a great interest in seeing the public schools improved so that they can avoid the burden of private tuition, yet they are denied a voice in school decisions. Parents with a child about to finish high school will have a vote in the running of school affairs, but the parent with a child about to enter school will not.

Reference to the validity of section 2012 as applied to persons other than plaintiff is not improper in the present case. Where the right to vote is restricted, the Supreme Court has considered more than the impact of the statutory scheme upon the plaintiff; it has based its decision upon the entire elective system of the jurisdiction whose law is challenged. For example, in Maryland Comm. for Fair Representation v. Tawes, the Supreme Court pointed out that:

in reviewing a state legislative apportionment case, this Court must of necessity consider the challenged scheme as a whole * * * the proper, and indeed indispensable, subject for judicial focus * * * is the overall representation accorded to the State's voters." 377 U.S. 656, 673, 84 S.Ct. 1429, 1439, 12 L.Ed.2d 595. (1964)

The necessity for this broad inquiry is is illustrated by the case before us. Each of the discriminations embodied in section 2012 is relevant to the Court's evaluation of plaintiff's claim, for together they emphasize the power of those with property rights to control school policy.

We should not lose sight of the fact that plaintiff sues on behalf of a class. As the Advisory Committee on Civil Rules reminded us in its Notes to new Rule 23, the class action is particularly useful in cases where it is contended that the constitutional rights of large numbers of people are being violated. 39 F.R.D. 98, 102 (1966) (notes to subdivision (b) (2)). The class should not be so narrowly and technically construed as to prevent a realistic evaluation of the legislation being challenged. In the class action now before us all those

disenfranchised would be entitled to vote if residency rather than ownership or rental of property were the prerequisite to voting. It seems appropriate, therefore, to view the class as encompassing all who lack requisite property rights.

### (ii) *Overall Scheme Improper*

Despite the "crazy quilt" of arbitrary and impermissible distinctions made by the statute, it is urged that the overall scheme is based on the rational policy of attempting to limit the right to vote to the patrons of the school district—the parents and the taxpayers—and that any minor disenfranchisements occasioned by this rational policy cannot be used to overturn it.

No statistics have yet been furnished —the case is still at the pleading stage— indicating how many otherwise qualified citizens are denied the right to vote in school board elections, but it seems safe to assume that the number is substantial. Even if the number were small, this would not justify arbitrary and discriminatory legislation. A statute which denied the right to vote to redheads would be no less unconstitutional because there was only one redhead in the community. So, here, the arbitrary discrimination cannot be justified on the ground that only a few citizens are denied a fundamental right.

Even if we assume that an overall rational policy need not fall because it works hardship in "isolated" instances, the scheme of section 2012 does not meet the exacting standards demanded by the Equal Protection Clause when the right to vote is involved. The "rational policy" on which defendants rely is that restriction of the vote to the parents of children attending the district's schools and resident taxpayers allows only those who use and pay for the schools to determine its policies.

In defendants' view such limitation has no more constitutional significance than a provision allowing only those assessed for sewer or water district expenses to vote in such special district elections. What has already been said about the importance of local educational policy makes unpersuasive an attempt to equate school districts with sewer districts.

The plain and simple truth known to every suburban resident is that plaintiff and those similarly situated are directly affected by, and do pay for, local schools. The local school system does have a pervasive influence on their lives. The Equal Protection Clause, therefore, requires that they be accorded the same electoral voice as any of their neighbors. The argument that the vote in school board elections is a local matter not of sufficient moment to be given the same preferential treatment as the right to vote for state legislators is unrealistic and should be rejected.

### (c) *Inadequacy of the Legislative Remedy*

It is no answer to plaintiff's prayer for relief that section 2012 is a matter of state law and that plaintiff may cast his vote for members of a properly apportioned state legislature, using his voting influence to seek repeal. Nor is it an adequate response to assert that if plaintiff does not like the way his federal state or county tax dollar is being spent by the local school board, he can vote in federal, state and county elections to express his objections. A person denied constitutional rights need not appeal to a majority of voters for redress. As the Supreme Court put the matter in Lucas v. Forty-Fourth Gen. Assem. of Colo., 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964):

> "While * * * a court of equity might be justified in temporarily refraining from the issuance of injunctive relief * * * in order to allow for resort to an available political remedy * * * individual constitutional rights cannot be deprived, or denied judicial effectuation, * * * because of the existence of a nonjudicial remedy * * *. An individual's constitutionally protected right to * * * vote cannot be denied * * * by * * * [the] majority of * * * [the] State's electorate * * *." Id.

at 736, 84 S.Ct. 1459, 1473, 12 L.Ed. 2d 632.

Consistent with the principle of limited delay to seek political redress expressed in *Lucas,* the Court might have been justified in awaiting the decision of the voters of the State on the proposed 1967 New York State constitution which would have outlawed the qualifications for voting in section 2012. Proposed New York State Constitution, Art. II, § 1 (1967). But the voters have rejected that proposed constitution. The time for delay has passed.

In any event, it is by no means clear that plaintiff has an effective political remedy in the state legislature. Although plaintiff is entitled to vote for representatives in a fairly apportioned legislature, the statutory scheme under the New York Education Law strips plaintiff of many potential allies in his quest for an equal voice in school matters. Section 2012 applies only to approximately one-third of the school districts in New York State. In the remaining districts, either the school board is appointive and a citizen's control over the board is exercised by his vote for the mayor who appoints the board or all citizens enjoy the vote. In the districts in which section 2012 applies, most citizens —owners of real property, apartment renters, and parents—are entitled to vote. Thus, in seeking an amendment, plaintiff would be forced to rely on the good will of a majority disinterested in his problem or opposed to any dilution of its own voting power. In attempting to alter allocation of any federal, state or county funds appropriated for education, plaintiff will lack support of other voters because most citizens already enjoy voting participation at the local school board level and have power to determine how public school funds are spent.

## 2. *First Amendment Issues*

The New York statute appears to be unconstitutional on other than equal protection grounds. First, it discriminates against some parents because of their religious beliefs by denying them the right to vote solely because they choose to send their children to parochial or other private schools rather than to public schools. Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). A wife of a lessee of real property can vote if her children go to public school but not if they go to private—in the main parochial—school. Second, it limits the effective power of non-voters in an important mode of expression and association. NAACP v. Button, 371 U.S. 415, 429–433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1966). Local school boards often pass resolutions directed to the state asking for new aid for educational programs and to the county with respect to the other forms of aid; recently they took public positions on the widely debated issue of repeal of Section 3 of Article XI of the New York State Constitution dealing with aid to parochial schools. Inability to vote and influence such school board resolutions reduces power to influence important action by the state. Since the parties have not presented these issues we need not decide them at this preliminary stage on a motion to dismiss. Cf. NAACP v. Button, id. at 444, 83 S.Ct. 328.

## B. *Claim Under the State Constitution*

Even if section 2012 could be thought to comply with the Equal Protection Clause of the Federal Constitution it probably cannot withstand attack under the New York State Constitution. Lower New York courts have held that section 2012 does not violate the State Constitution. Turco v. Union Free School Dist. No. 4, 43 Misc.2d 367, 251 N.Y.S. 2d 141 (Sup.Ct.1964), aff'd, 22 A.D.2d 1018, 256 N.Y.S.2d 553 (2d Dep't 1964). Nevertheless, a recent Court of Appeals case striking down property qualifications for town office as an unreasonable classification and as an impairment of the voter's right to a wide choice of candidates strongly suggests that New York's highest court is ready to find that New York's Constitution outlaws property qualifications for voters. Landes v. Town of North Hempstead, 20 N.Y.2d

417, 284 N.Y.S.2d 441, 231 N.E.2d 120 (1967).

The Court of Appeals in *Landes* declared:

"Turning * * * to the plaintiff—along with other residents of the town—as voter, the proscription against nonlandowners as town councilmen amounts to a 'dilution' or 'debasement' of the vote not unlike that occasioned by the malapportionment which the Supreme Court has held violative of the equal protection clause. * * * The statutory restriction also violates section 1 of article 1 of the State Constitution which provides that 'No member of this state shall be disfranchised, or deprived of any of the rights or privileges secured to any citizen thereof'. Wide latitude in choosing public officers is among the right secured by this constitutional provision. In effect, it vests electors with the right to choose public officers 'on whatever principle or dictated by whatever motive they see fit, unless those motives contravene common morality'. * * * The denial of such a right to electors on property grounds becomes more egregious today, when a large proportion of the population in many towns, especially in suburban areas, are apartment house dwellers. Moreover, we know from experience that it is often the wife who holds record title to a home or other property and that with increasing frequency, owners of real property have occasion to place the record ownership in real estate investment trusts or syndicates." 284 N.Y.S.2d at 444–445, 231 N.E.2d at 122. (footnote omitted).

Section 2102 of the Education Law provides that a school district officer must be a "qualified voter of the district." This provision, which incorporates the property requirement of section 2012 by reference, seems to be unconstitutional under the *Landes* test. But cf. statement of Attorney General of New York, N.Y.L.J., Jan. 19, 1968, p. 1 (*Landes* requires elimination of property qualification in Town and Village laws but not in Education law because parents without property and renters can vote). If section 2102 must fall it seems unlikely that 2012—whose terms cause the infirmity—can stand under New York law.

Having jurisdiction by virtue of the substantial federal question raised in the complaint, this Court has power to decide state issues arising out of the pleadings. United Mine Workers v. Gibbs, 383 U.S. 715, 721–729, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933); Siler v. Louisville & Nashville R. Co., 213 U.S. 175, 29 S.Ct. 451, 53 L.Ed. 753 (1909).

Although ordinarily a federal court would decide a case on a dispositive state ground in order to avoid a constitutional dispute, the nature of the issues in this case make that rule inapplicable. Here, the answer to the federal constitutional question seems clear while the decision on the state ground would be based largely on an extrapolation of a single case. In these circumstances, the Court should place primary reliance on the federal ground.

The suggestion that this Court should abstain in order to let the state courts clarify state law and possibly avoid the federal constitutional question is unacceptable. In the context of the deprivation of fundamental rights, the federal courts should not abdicate their power to redress such important wrongs. See Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed. 444 (1967); Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed. 2d 377 (1964); Note, Federal-Question Absention: Justice Frankfurter's Doctrine in an Activist Era, 80 Harv.L.Rev. 604 (1967).

## CONCLUSION

Viewed either as a matter of federal or state constitutional law, a claim that

section 2012 is invalid is supportable. The motion to dismiss should be denied. Plaintiff should not be precluded from introducing evidence to support his claim for relief.